POTTER *against* PAYNE.

Where the plaintiff claimed title to the goods in question under a mortgage
   bill of sale from  *C*,  to secure the payment of *C's* notes, payable in three
   months ; and the plaintiff immediately exposed the goods for sale, and was
   in the act of selling them, from time to time, as he could find purchasers,
   the mortgagor being insolvent ; when the defendant, a deputy-sheriff, attached them, in suits against the original owners, claiming that the conveyances to the plaintiff were fraudulent, as against creditors ; the defendant, in an action of trespass against him for thus taking the goods, prayed
   the court to charge the jury, that the plaintiff had no right to sell the goods
   until after his notes fell due ; which the court omitted to do ; it was held,
   that the defendant, being a stranger to the mortgage transaction, had no

right to interfere between the plaintiff and his mortgagor; and as evidence of fraud, the defendant had the benefit of the fact before the jury; consequently, the omission of the court was no ground for a new trial.

Though the court, on mere questions of fact, reluctantly interferes with the verdict of a jury, and will do so, only in a very clear and strong case; yet where the question is one of fraud in the sale of goods, evinced, by the want of that change of possession which the law requires, to render the sale valid as against creditors, or by a change of possession merely colourable, there is such a blending of the facts with the law on the subject, the whole being submitted to the jury together, as frequently to render it necessary for the court, to avoid injustice, to be more liberal in the granting of new trials.

Thus, where the plaintiff claimed title to goods, by virtue of two assignments, first, from *A & B* to *C*, and then, from *C* to the plaintiff; and, in trespass for subsequently attaching the goods, as the property of *A & B*, by their creditors, the defence was, that the assignments were fraudulent as against creditors; and the jury gave a verdict for the plaintiff; on a motion for a new trial for a verdict against evidence, the evidence, in the opinion of the court, shewed, that there was no substantial change of possession; and therefore, a new trial was granted.

Tнis was an action of trespass *de bonis asportatis;* tried at *Norwich, March* term, 1851.

On the trial, it was proved, that the goods in question had belonged to *Redfield & Potter;* and the plaintiff claimed, that *Redfield & Potter*, by a bill of sale, dated *October* 14th, 1848, for a valuable and *bona fide* consideration, sold and assigned them to *Charles Redfield;* and that *Charles Redfield*, being indebted to the plaintiff in the sum of 4,739 dollars, by two promissory notes, one for 4,514 dollars, and the other for 225 dollars, payable to *Redfield & Potter*, or order, three months from the date, and by them indorsed to the plaintiff, by a mortgage bill of sale, dated and executed on the 4th day of *January*, 1849, conveyed them to the plaintiff; the condition of the mortgage being, that *Charles Redfield* should pay said notes according to their tenor. And the plaintiff claimed, that by virtue of such mortgage bill of sale, he took and retained immediate possession of said goods.

It was further proved, that the defendant, as a deputy-sheriff, by virtue of several writs of attachment, in favour of the creditors of *Redfield & Potter*, legally served, attached the goods in controversy as their property; which goods were afterwards sold, in due course of law, on executions in favour of such attaching creditors. The defendant thus justi-

fied the taking and carrying away of said goods, as alleged
in the plaintiff's declaration.

To avoid the prior claims of the plaintiff, the defendant
also introduced evidence to prove, and claimed that he had
proved, that the bills of sale from *Redfield & Potter* to
*Charles Redfield,* and from *Charles Redfield* to the plaintiff,
were fraudulent and void, as against the creditors of *Redfield & Potter;* and especially, that the plaintiff had not
taken any possession of said goods, under the bill of sale to
him, but that *Redfield & Potter* had been permitted, without
any legal reason therefor, to retain possession of said goods
and to controul them, in the same manner as before the bill
of sale was given.

The defendant also claimed, that it was proved, on the
trial, that if the plaintiff had taken any possession of said
goods, and exercised any controul over them, he had made
sale of some part of those described in his mortgage bill of
sale before any part of the notes described therein had fallen
due.

In relation to the consideration of the bill of sale from
*Redfield & Potter* to *Charles Redfield,* and the possession of
the goods, the testimony in the cause was substantially as
follows :

1. The deposition of *William W. Baker.* I commenced
living with the late firm of *Redfield & Potter,* in *New-London,*
*April* 3d, 1848. In *September* of that year, Mr. *T. C. Potter,* one of the firm, was so sick as to be unable to be at the
store, and continued growing worse, so that he was in the
store but very little from that time. About *December* of that
year, on one *Monday* morning, when I came down to the
store, I found Mr. *Charles Redfield* there, who came to the
store, on that morning, earlier than usual, and he said to me,
" *William,* would you like to continue in the store ? I have
bought out the goods of *Redfield & Potter.*" I told him, I
should like to remain. After breakfast, Mr. *David Redfield*
came in, and says, " Well *Charles, William* is going to continue on with you." *Charles* said, " Yes." The stock then
was very thin indeed—almost all run out—remnants. Mr.
*David Redfield* would be in and out, mornings, later than
formerly, settling up his accounts, and attending to his work
that he was making for Mr. *Loomis.* I continued in the

store, and would occasionally collect bills for Mr. *David Redfield*, and get out trimmings for the goods he was making up for Mr. *Loomis*. When *Charles Redfield* bought out, the sign was painted over, and *Charles Redfield's* name put up. Some time in *January*, that sign was taken down. I did not inquire why the sign was taken down, as I was then owing them for goods taken up more than my wages would come to. Mr. *Thomas Potter* was occasionally in and out of the store. I knew nothing about the transfer to Mr. *Potter*. I have heard so since. About the last of *January*, or the first of *February*, I was away from the store in the forenoon, carrying some work to be made, and came back about one o'clock, when I found the doors of the store shut, and curtains up to the windows. I rapped at one of the doors, and Mr. *Nehemiah B. Payne* lifted up the curtain, and seeing who I was, let me in ; and Mr. *David Redfield* said to me, " Mr. *Payne* has attached these goods." *Charles Redfield* had been away, at that time, from the time the sign was taken down. I think Mr. *Payne* was waiting for Mr. *Bristol*. About two o'clock, Mr. *Bristol* came in, and after talking with Mr. *Payne*, a short time, they commenced taking down goods, and measuring them. About three o'clock, Mr. *Goddard* came in, and he went to measuring goods, the same as the rest. Mr. *David Redfield* would measure them, after they had done so, and take account, marking the cost upon a piece of paper.

*Question* by *A. C. Lippett*, Esq., counsel for plaintiff. After *Charles Redfield* told you he had bought out *Redfield & Potter*, who had charge of the store ?

*Ans.  Charles Redfield.  David Redfield* was in and out, settling his bills, and attending to his own accounts.

*Question* by the same. Had *David Redfield* a desk in the shop, where he settled his accounts ?

*Ans.*  He had in the rear part.

*Question* by the same. From the time of the sale of *Redfield & Potter* to *Charles Redfield*, was *Thomas C. Potter* ever in the store to do business ?

*Ans.*  He was not.

*Question* by the same. Have you any knowledge of any inventory being taken by *Redfield & Potter*, prior to the sale to *Charles Redfield ?*

*Ans.* Evenings, after the goods were put away, and there *New-London,*
July, 1851.

Potter
*v.*
Payne. was no one in, they would be taking an account in a little book of theirs, taking down pieces and measuring them. I asked one of them, *Charles,* I think, what they were doing? He said, they were taking an inventory.

*Question* by the same. Had you any knowledge, at that time, that the firm of *Redfield & Potter* were about to break up their business?

*Ans.* I would often hear Mr. *Redfield* say, when he was talking with others, that he was tired of the dry goods business, and was thinking about going out *West.*

*Question* by the same. After the sign of *Charles Redfield* was taken down, about how often was Mr. *Thomas Potter* in and out of the store? How many times a day?

*Ans.* I don't know that he was in there, every day : he would often be in, and talk to Mr. *David Redfield;* and I overheard him once, speaking about *Charles's* intemperance.

*Question* by the same. Did Mr. *Charles Redfield,* while he had charge of the store, purchase any new goods, to your knowledge?

*Ans.* No, sir.

*Question* by the same. Had the season arrived for the purchase of spring goods, prior to taking down the sign?

*Ans.* No, sir ; I should think not. I didn't know exactly the time when spring goods were purchased.

*Question* by the same. After the sale from *Redfield & Potter* to *Charles,* did *David* take any charge of the store?

*Ans.* No ; not up to the time when the sign of *Charles Redfield* was taken down. He was merely in and out, settling up his accounts, preparing to go *West.*

*Question* by the same. Who paid you for your services, after *Charles* took charge of the store?

*Ans.* No one ; I was owing them, at the time when I left, *February* or thereabouts. My whole services did not square the account.

*Question* by *Lewis Bristol,* Esq., counsel for defendant. Have *Redfield & Potter* ever called upon you for that balance?

*Ans.* No, sir. I was not situated so that I could pay, at the time. *David Redfield* went away ; and nothing has been said about it since.

*Question* by the same.  Did *Redfield & Potter* ever call upon you, before they went away ?

*Ans.*  Mr. *David Redfield* spoke to me about it, a day or two before he went away, I think.  I told him the circumstances, and he said " Well." Mr. *Thomas C. Potter* was, I believe, away.

*Question* by the same.  Did you not expect that your services to *Charles* would go against your indebtedness to *Redfield & Potter ?*

*Ans.*  I supposed that they would.

*Question* by the same.  Was there any thing said by *David*, in that conversation that you had with him, in regard to this matter, to the contrary of that ?

*Ans.*  No, sir.

*Question* by the same.  Did you reckon up how much you were indebted ?

*Ans.*  Yes ; I did a few days before Mr. *Redfield* left.  I reckoned it from the time I commenced to the time I left.

*Question* by the same.  Did you and *David* have any conversation in regard to the amount due them ?

*Ans.*  I told him, you are going away, and I have been reckoning up, to see how much my wages come to ; and I told him how much I was indebted to the firm, and that it was not convenient for me, at that time, to settle it.  All he said was, " Well."

*Question* by the same.  Did *David* appear to know, that you had reckoned *in* the time you had been with *Charles ?*

*Ans.*  Yes, he did.

*Question* by the same.  How long was it from the time *Charles's* sign was put up until it was taken down again ?

*Ans.*  I should think about a month.  About a week after the sign was put up, *Charles* gave me notice of the fact.

*Question* by the same.  What did *David* do, in that store, during the time *Charles* pretended to have the management of it ?

*Ans.*  He was in and out, settling his accounts, and attending to the work he was getting cut up and made for Mr. *Loomis*.

*Question* by the same.  Was he not in the store by far the greater part of the time ?

*Ans.*  Not more than half of the time, if he was that.  He

came very late in the forenoon, and stayed till two or three *New-London,*
July, 1851.

———

Potter
*v.*
Payne.
in the afternoon; and was in and out during that time.

*Question* by the same. Did *David* attend to any of the customers, during that time?

*Ans.* He occasionally did, when we were busy and had other customers. He took no interest in it, but merely showed the goods. I don't recollect that he ever took any pay for it. He would often call me, if I was out in the back part of the store, and *Charles* was not in.

*Question* by the same. After *Charles's* sign was taken down, I understood you to say, that *David* had the entire management.

*Ans.* Yes.

*Question* by the same. During the time *Charles* pretended to have the management of the store, was he attentive to his business?

*Ans.* Not so attentive as became the boss of the store. He was out oftener than he used to be, when he was a clerk; it was about the time when he was in a bad way.

*Question* by the same. What kind of a "bad way" was he in?

*Ans.* I would often hear of his being out, late at night; and once or twice, I heard that he slept out all night. He often appeared sleepy, in the store; and did not seem to take much interest in selling. He would sometimes be short with customers—would merely show them, and did not seem to try to make them take the goods, so much as he ought to.

*Question* by the same. Did he not frequently exhibit the effects of liquor?

*Ans.* Yes, sir. His breath often smelt as if he had been drinking liquor. I never saw him *tipsy* in the store; so that he could not get around, I mean by *tipsy.*

*Question* by the same. Did he show the effects of drinking liquor before he took charge of the store?

*Ans.* Not of any account. I thought he was getting in rather a bad way, just about the time he took charge; and he kept growing worse from that time.

*Question* by the same. Was it not known to you, that *Charles* had frequently been intoxicated, before he took charge of the store?

*Ans.* I never saw him intoxicated before.

*Question.*   Had you not frequently seen him when you believed him to be under the influence of liquor, although not quite intoxicated ?

*Ans.*   No, sir; not before he bought out.

*Question.*   Did not his breath smell before that time ?

*Ans.*   I think that I had smelt his breath, as though he had been drinking a little ; but I never saw any other effects of it.   He always appeared to be as smart as ever.

*Question.*   Had not *David* been accustomed to sit at the desk, in the rear of the store, before *Charles* took charge ?

*Ans.*   Yes, sir.   He kept the books, and did the writing for the firm.

*Question.*   What goods were those that *David* took out with him to *Indiana ?*

*Ans.*   All that I know of, were Mr. *Loomis's.*

*Question.*   How did you know they were Mr. *Loomis's* goods ?

*Ans.*   He said so ; and Mr. *Loomis,* while Mr. *Beckwith* was there cutting, would often be in, looking at them, and talking about them.

*Question.*   How do you know that those were the goods he took out with him to *Indiana ?*

*Ans.*   I don't know, only what he told me he was a going to take.

*Question.*   What goods were those sold at auction, by Mr. *Thomas Potter,* after the attachment ?

*Ans.*   I know nothing about what were so sold.   I was in *New-York,* at that time.

*Question* by *A. C. Lippett,* Esq., for the plaintiff.   When was *Charles's* sign taken down ?

*Ans.*   I could not tell the time.   I should think some time in the latter part of *December.*

*Question* by the same.   What was the *Loomis's* work that you have spoken of ?

*Ans.*   It was the goods, clothing, pantaloons and coats, made up by Mr. *Redfield,* for Mr. *Loomis,* out of his satinets.

*Question* by the same.   Do you know when the firm of *Redfield & Potter* was dissolved ?

*Ans.*   No, sir.

*Question* by the same.   How long had *Charles Redfield* been clerk to *Redfield & Potter,* prior to his purchase ?

*New-London,*
July, 1851.

Potter
*v.*
Payne.

*Ans.* I don't know. He was there when I went there, and continued in the store till his sign was taken down.

*Question.* During the continuance of the firm of *Redfield & Potter*, did *David* attend the sales, or did he merely keep the books?

*Ans.* He attended to both. He was a very fast writer, and was at the books but a little while at a time. He wrote the books generally evenings.

*Question* by *Lewis Bristol*, Esq., for the defendant. How old were you at the time *Charles* had charge of the books?

*Ans.* Not quite fifteen.

*Question* by the same. Did you not tell me, a short time ago, that *Charles* had charge of that store until the time of the attachment.

*Ans.* No, sir.

*Question* by the same. Did not you say, that you could perceive no difference between the actions of *Charles* and *David*, between the time *Charles* took charge of the store, and the time of the attachment?

*Ans.* No, sir. I told you I *could* see a difference.

*Question* by the same. Did you say to me, that *David* took any more charge of the store after the assignment to Mr. *Potter* than he did while *Charles* had it?

*Ans.* I told you, I thought he did. I told you, our stock was low at that time; *Charles* was away, and *David* was in then.

*Question* by the same. What was the situation of the stock of goods?

*Ans.* It was very much reduced. Any one could see that there had been no goods bought very lately; there were no desirable goods there.

*Question.* Did customers fall off very much, in consequence of this?

*Ans.* Yes, sir.

*Question* by *A. C. Lippett*, Esq. In whose name were the books kept and the bills made, after *Charles* bought out *Redfield & Potter?*

*Ans.* *Charles Redfield's.*

2. The testimony of *Thomas Potter*, the plaintiff, who testified as follows. *Thomas C. Potter*, one of the firm of *Potter & Redfield*, was my son, and is now deceased; and *David*

*Redfield,* the other member of that firm, is·my son-in-law. I lent them money from time to time, and the balance was about 4,000 dollars in my favour. I had also indorsed their notes for about 450 dollars. *Thomas C. Potter* was sick, and unable to attend to business; and I advised them to close their business. They soon did so. They sold to *Charles Redfield,* who had been their clerk, and he assumed the payment of the debts due to me, and gave me his notes, indorsed by *Potter & Redfield.* He was then a steady and competent man. I soon afterwards discovered, he was getting into intemperate habits, and I then insisted upon additional security for my debts; and he gave me the bill of sale under which I claim; and, at the same time, he delivered to me the key of the store. I was not at all acquainted with the dry goods business, and I agreed with *David Redfield* to assist me, as a clerk; and he did, until the defendant attached the most saleable goods. The residue of the goods, not attached, I have been selling, and the avails I have applied on my notes secured by the bill of sale. When *Redfield & Potter* sold to *Charles Redfield,* their sign was taken down from the store, and his put up in its place; and when *Charles Redfield* sold to me, his sign was taken down. I have paid the rent of the store to the landlord.

On cross-examination, he testified thus: I knew that *Redfield & Potter* were about selling out to *Charles Redfield,* and I did not know that he was a man of any estate. *David Redfield,* after the sale by *Potter & Redfield,* stayed generally at the store, engaged in settling his old business; and perhaps he occasionally assisted *William W. Baker,* the clerk, in waiting on customers. *William W. Baker* had been a clerk for *Potter & Redfield.* My son, the said *Thomas C. Potter,* left the store entirely, and died not long after. *Charles Redfield* had nothing to do with the store, or the business, after his mortgage to me. I did not know the form or way in which the business was done, by which the goods were mortgaged to me, at the time. *Baker* remained in the store, as clerk, after·the mortgage.

3. *Allen D. Smith* testified thus. I do business next door to *Redfield & Potter's* store. I knew they had sold out to *Charles Redfield;* and soon after, their sign was taken down, and *Charles Redfield's* put up. Before this, *Charles*

*New-London,*
July, 1851.

Potter
*v.*
Payne.

*Redfield* appeared to be straight and correct, and capable of doing business.

4. *Charles A. Latimer's* testimony. I left about the middle of *September*, 1848. *Charles Redfield's* sign was put up, and he did business there, and borrowed money of me. I do not know that *Charles Redfield* had any other property.

On the part of the defence.

1. *A. W. Tucker* testified, that he knew *Charles Redfield* while he was clerk of *Redfield & Potter.* He was then occasionally intoxicated.

2. *William Bargett* testified, that *Charles Redfield* was intemperate before he purchased of *Redfield & Potter.*

3. *Ralph Sizer* testified, that before *Charles Redfield* purchased the goods of *Redfield & Potter*, he had seen him much intoxicated.

4. *N. B. Payne*, the defendant, testified, that he served three attachments against *Redfield & Potter.* I found *David Redfield* in the store; he was then alone. He said the goods did not belong to him. He sent out, and *Thomas Potter*, the plaintiff, came in. We took the goods, and boxed them up. I acted under the direction of the creditor's attorney. *Redfield & Potter* were always in possession, as I supposed. I saw the sign was changed, but the same men were there as before.

5. *John A. C. Gray*, the attaching creditor, testified, that *Redfield & Potter* were indebted to them in about 1,100 dollars, and wanted an extension. *Redfield* told me, he had made a sale, temporarily, to his brother *Charles*, so as to get further time, and expected his father-in-law, the plaintiff, to aid in this. That *Charles* was not worth any thing. He said he should have the controul of the business as before. So I gave time, by taking *Potter & Redfield's* note, indorsed by *Charles.* Afterwards, I called on the plaintiff, and asked him if *Charles* had sold out to him. He said, no; he had not bought out *Charles*—*Charles* did not owe him, but *Redfield & Potter* did. He said *David Redfield* was in the habit of doing just as he had a mind to, and referred me to him. *David Redfield* had charge at the store, on 20th of *October*, 1848; my note matured on the 18th.

6. Mr. *Avery* testified, that he was clerk of *Gray & Co.*,

in *New-York;* and *David Redfield,* in *New-York,* told *Gray,* that he should be paid, if he could get an extension.

*Thomas Potter,* the plaintiff, was called again, and testified, that Mr. *Payne* was mistaken as to *David's* being present, when the goods were sold. *Gray* called on me, as he says, and I told him I had a bill of sale of the goods, and had a claim on them ; and the testimony of *Gray* as to my conversation with him, is false. I told him I bought the goods of *Charles Redfield;* and I never told him, that I knew nothing about the sale, and that *David* and the boys managed as they pleased.

The defendant, on the argument of the cause, claimed, that the plaintiff had no legal right to make sale of any of the goods mortgaged to him, by the bill of sale, until after the debts due to him from *Charles Redfield* became due ; and claimed, that the court should so charge the jury ; but for what purpose this claim was made, was not stated. The court did not so charge the jury.

The jury returned a verdict in favour of the plaintiff, for the value of the goods taken by the defendant, and the interest thereon. The defendant thereupon moved for a new trial, because the court declined to charge the jury as claimed by the defendant ; and because the verdict was against the evidence in the cause.

*L. Bristol* and *G. W. Goddard,* in support of the motion, contended, 1. That the verdict, in this case, was contrary to the evidence, as it did not show a real and substantial change of possession. *Osborn* v. *Tuller,* 14 *Conn. R.* 529. *Carter* v. *Watkins,* 14 *Conn. R.* 240. *Crouch* v. *Carrier,* 16 *Conn. R.* 505. *Kirtland* v. *Snow,* 20 *Conn. R.* 23.

First, the sale to *Charles Redfield,* by *Redfield & Potter,* was fraudulent and void as to creditors. It was made by men in failing circumstances, to a man worth nothing, his notes being taken in payment, and those notes so indorsed, that the goods and effects of *Redfield & Potter* (pretended to be sold to him,) in his hands, could not be attached for their debts ; and *Charles Redfield* could not be copied, *Redfield & Potter* having got an extension from their creditors, and having given their notes, with *Charles Redfield's* indorsement, to their creditors ; and before the last-mentioned notes became due, the bill of sale was made to *Thomas Potter.*

*David Redfield*, one of the firm of *Redfield & Potter*, the
only man capable of acting, (*Thomas C. Potter*, the other

member of the firm of *Redfield & Potter*, the son of *Thomas
Potter*, having some time previously left the firm entirely, on
account of sickness,) remained in the store, after the pre-
tended sale to *Charles Redfield*, and assisted him in selling
goods.

There should be an actual visible change, so that creditors
and others may be able to see it. If they find the goods in
the possession of their debtor, that is enough, unless the
claimant of the goods can give a reasonable excuse for want
of change of possession. As much change of possession as
is claimed in this case, might be given in any case, where a
person wanted to make a fraudulent transfer of his goods.
He could pull down the sign, make out a bill of sale to a
worthless brother, and place himself in one corner of the
store, where he could overlook every thing that was done,
and bid defiance to his creditors ; and this is all that was
done in this case. There is no valid excuse given for *David
Redfield's* remaining in the store. The settlement of his ac-
counts might have been done up as well at some other spot.
In the case of *Osborn v. Tuller*, the debtor went entirely out
of possession for some time, but afterwards began to assist
in using the property ; and this was held fraudulent. Here,
*Redfield & Potter* paid the clerk for the time he was said to
be under *Charles Redfield*.

Secondly, the sale from *Charles Redfield* to *Thomas Potter*,
was fraudulent and void, as against creditors, for want of
change of possession. The only change of possession was
the delivery of the key of the store to *Thomas Potter*. *Wil-
liam W. Baker*, the clerk of *Redfield & Potter*, then in the
store all the time, knew nothing of the sale to *Thomas Pot-
ter ;* and none of the witnesses knew any thing of it, except
*Thomas Potter* himself. This is not such notoriety as the
law requires.

2. That the judge on the trial, erred, in not charging the
jury, that the plaintiff had no legal right to make sale of the
goods mortgaged to him, until the debts due to him from
*Charles Redfield* became due ; for the reason that the jury
might infer from such conduct, that the bill of sale to *Charles
Redfield* from *Redfield & Potter*, was a mere sham—a sort of

cover to prevent the goods from being attached as the property of *Redfield & Potter ; Charles Redfield* being a mere conduit of the goods from *Redfield & Potter* to *Thomas Potter*.

*Foster* and *Lippitt*, contra, contended, 1. That a new trial will not be granted, unless the verdict be *manifestly* and *palpably* against the evidence in the cause. *Bacon* v. *Parker*, 12 *Conn. R.* 212. *Palmer* v. *Hyde*, 4 *Conn. R.* 426. *Bulkley* v. *Waterman*, 13 *Conn. R.* 328. 333. *Talcott* v. *Wilcox*, 9 *Conn. R.* 134. *Lafflin* & al. v. *Pomeroy*, 11 *Conn. R.* 440.

2. That the proof in this case clearly sustains the claims of the plaintiff. First, the assignment from *Charles Redfield* to the plaintiff was *bona fide*—the consideration ample. If this fact was denied on the trial, it was found by the verdict.

Secondly, the conveyance from *Redfield & Potter* to *Charles Redfield*, was also found by the jury to have been *bona fide*. Possession was taken at the time of sale, *October* 14th, 1848, and was retained by him till *January* 4th, 1849, when sale was made to *T. Potter*, the plaintiff. The old sign was taken down, and a new one put up. The attaching creditors took the notes of *Redfield & Potter*, endorsed by *Charles Redfield*. The firm of *Redfield & Potter* was dissolved. *Thomas C. Potter* was never again in the shop. *David* took no part in the trade of the store. He was wholly engaged in settling up his accounts, and attending to the business of Mr. *Loomis*. The jury necessarily found the transaction *bona fide*, and that possession accompanied the sale, as they might do, with such evidence.

Thirdly, possession was delivered by *Charles Redfield*, and taken by the plaintiff, with a bill of sale ; the key of the shop given to the plaintiff. He took down the sign of *Charles Redfield*, and assumed upon himself and paid the rent of the store. He held controul of the store, and was in there much of the time. On the other hand, *Charles Redfield* was never in there, after the transfer to the plaintiff. *David Redfield* was employed by the plaintiff as a clerk, but never had controul of the property. If the transfer of *Redfield & Potter* to *Charles Redfield* was *bona fide*, (and the jury have said that it was,) might not the plaintiff employ

*New-London,*
July, 1851.

Potter
*v.*
Payne.

*David Redfield* as a clerk to assist him, the plaintiff having controul of the property ? *Charles Redfield* was the grantor of the plaintiff, and he was never in the store after the transfer. This is not like the case of *Crouch* v. *Carrier,* 16 *Conn. R.* 505. nor *Kirtland* v. *Snow,* 20 *Conn. R.* 23.

3. That in a case where the court might come to a different conclusion, on a statement of the evidence, a new trial will not be granted, if the proof in the case will justify the jury in their verdict. *Bishop* v. *Perkins,* 19 *Conn. R.* 300. *Clark* v. *Whitaker, Id.* 319. *Johnson* v. *Scribner,* 6 *Conn. R.* 185. *Babcock* v. *Porter,* 20 *Conn. R.* 570. *Hammond* v. *Wadhams,* 5 *Mass. R.* 353. *Coffin* v. *Phœnix Ins. Co.* 15 *Pick.* 291.

4. That a new trial will not be granted, though the judge omit to charge as requested, if the point be immaterial. *Hoyt* v. *Denison,* 5 *Day,* 479. *Toby* v. *Reed,* 9 *Conn. R.* 216. *Selleck* v. *Sugar Hollow Turnpike Co.,* 13 *Conn. R.* 453. *Dulles* & al. v. *De Forest* & al. 19 *Conn. R.* 190. *Fitch* v. *Chapman,* 10 *Conn. R.* 9. *Holly* v. *Brown,* 14 *Conn. R.* 256. Here, the object of the claim was not stated; nor was the point material.

5. That the charge of the judge gave the defendant the full benefit of the law in the case; and the verdict is in accordance with justice. If a new trial were to be had, there is no reason to suppose the verdict would, or ought to be, different. Hence, the discretion of the court should be exercised against the motion.

HINMAN, J. The plaintiff's title to the goods in question, was a mortgage bill of sale, to secure the payment of certain notes. Immediately after he took his mortgage, he exposed the goods for sale, and was in the act of selling them, from time to time, as he was able to find purchasers, when the defendant attached them. The defendant claimed, and requested the court to charge the jury, that the plaintiff had no right to sell the goods, until after his notes fell due. If there was no other infirmity in the plaintiff's title than this, we think he would be entitled to retain his verdict. The defendant did not attach the goods subject to the mortgage, but in opposition to it. Indeed, they are of much less value than the amount of the notes; and the mortgagor, being in-

solvent, there was nothing but a naked equity, of no possible value, to attach, if the mortgage was valid. The defendant then was a stranger to the mortgage transaction, and could have no right to interfere between the plaintiff and his mortgagor. It was the mortgagor's business to protect his own interests; and if he did not complain, it seems clear, that no third person could do so. The conduct of the plaintiff, in reference to the property, was a proper subject for the consideration of the jury, on the question of fraud; and for this purpose, it was, without doubt, made use of; and this seems to us, the only legitimate use that could be made of it. We are satisfied, therefore, that, in the view now taken of it, by the defendant, it was an immaterial fact; and the court was correct, in not charging the jury upon it, as requested. We do not, therefore, advise a new trial, on this ground.

The remaining question is, whether the verdict is against the evidence in the cause; and, on this ground, we think, a new trial must be granted. There is much evidence going to show, that both the transfers of the property were fraudulent in fact,—at least, on the part of the vendors. The testimony of the creditor, *Gray*, and of his clerk, goes very strongly to show this; and the circumstances stated by *Baker*, tend the same way; and then, the sales were family transactions, sweeping off all the vendor's property at once, and were supported, for the most part, by family witnesses; and the first one was on credit, to a young man destitute of means, a clerk in the store, and whose habits were such, as to render him unworthy of credit, irrespective of his want of property. All this and more, from the testimony of *Baker*, makes, we think, a strong case of fraud in fact. But we do not place the case on this ground; and, therefore, it is not necessary to dwell upon it.

On mere questions of fact, this court reluctantly interferes with the verdict of a jury; and it should be a very clear and strong case, that should induce us to do so. But where, on a sale of goods, there is a want of that change in the possession of them, which the law requires, to render the sale valid, as against creditors; or, where the evidence is such as to show that such change as has taken place, is colourable merely, it stands on very different ground. In questions of

*New-London,*
July, 1851.

Potter
*v.*
Payne.

this sort, there is such a blending of the facts with the law on the subject, as makes it necessary to submit the whole to a jury; and there is often great reason to apprehend, that it is considered by them to be their province to determine the law, as well as the facts in the case, and that it is submitted to them for that purpose.    Where this is so, it is necessary to be more liberal in granting new trials, or injustice will often be done.    It has, therefore, been our practice, not only to grant new trials, where there is no evidence of any change in the possession, accompanying and following a sale, but also in those cases, where the evidence is such as to satisfy the court, that such change as has taken place was colourable, and not a real or substantial change.    *Crouch* v. *Carrier*, 16 *Conn. R.* 505.    *Bishop* v. *Warner*, 19 *Conn. R.* 460. *Kirtland* v. *Snow* & al. 20 *Conn. R.* 23.

What, then, does the evidence prove, in regard to the possession of these goods, following the sale to *Charles Redfield,* and the mortgage from him to the plaintiff?

The testimony, on this point, comes chiefly from the plaintiff himself, and from the clerk, *Baker:* indeed, all of it, except the single fact stated by Mr. *Latimer,* in regard to the sign on the store being changed, on the purchase of the goods by *Charles Redfield.*    In substance, the evidence seems to prove, that previous and up to *December,* 1848, *Potter & Redfield* were engaged in trade, at a store in *New-London,* with *Charles Redfield* and *William W. Baker,* assisting them as clerks.    The partner, *Potter,* being in feeble health, had, for some time, neglected to attend at the store; so that the only persons having charge there were *David Redfield* and the clerks.    *David* was the book-keeper, and, for the most part, was engaged at his desk, in the rear of the store.    The firm was indebted to the plaintiff, in about the sum of 4,000 dollars.    The plaintiff testifies, that in consequence of the sickness of his son, he advised them to close up their business; and they did so, by selling to *Charles Redfield,* their clerk, who gave his notes for the plaintiff's claim, indorsed by the firm.    He knew nothing of any change in the possession of the goods, or of the store, except that the old sign was taken down, and one with the name of *Charles Redfield* substituted for it.    He states, that he soon discovered that *Charles* was getting into intemperate habits, and he then in-

sisted on additional security ; and, thereupon, *Charles* gave him the mortgage bill of sale, under which he now claims title ; and immediately, on taking his mortgage, he employed one of the original partners, *David Redfield,* to sell the goods, as his clerk.

Now, it will be observed, that the only visible act, evincing a change of ownership in the goods, except, merely, the delivery over of the bills of sale, and the formal delivery of the key of the store to the plaintiff, was the changing of the sign on the store. *Baker* does, indeed, state, that he observed them taking down and measuring goods, after the first sale ; and he was informed, that this was for the purpose of taking an inventory. But, it was done in the evenings, after the store was closed, and, of course, could not be known, except to the parties. And *Baker,* himself, seems hardly to know whether an inventory was in fact taken. He says, that he was informed of the sale to *Charles ;* and yet, his account with the old firm kept on, while *Charles* was claiming to own the goods, as before, and he did not even know of the mortgage to the plaintiff ; and during all the time, up to the attachment, *David Redfield* was at the same desk, in the rear of the store, attending to the settlement of his accounts, occasionally waiting upon customers, and, some of the time, at work preparing goods to send *West* to his agent, *Loomis.* Looking, then, as any stranger to these contracts, or creditor of the firm, must be supposed to look at their business, he finds *Redfield & Potter* apparently engaged, with their clerks, in the same store, and in the same manner of doing their business ; and up to the very day of the attachment, there was no change in the tenancy of the store. *Redfield & Potter* continued to hold it, as they had done before ; and *Redfield,* being actually there, in possession, he must be presumed to be there, under his lease, and not by the mere sufferance of his brother *Charles.* It is true, the plaintiff states, that he paid the rent after he took his mortgage ; but he does not claim, that he came under any obligation to do so, either by agreement, or otherwise. Every thing that was done, then, was to change the sign, when *Charles Redfield* purchased. We cannot think this was enough. The parties could easily have changed the ownership of the store, for the time being ; and we do not see, how we can say, there was any real, sub-

stantial change in the possession of the goods, while the store which contained them, was in the possession of the original owners. We think, too, that *Redfield's* continuing at the store, and occasionally waiting upon customers, is very strong evidence, that the sale was merely colourable.

Upon the whole, then, we advise a new trial.

In this opinion the other Judges concurred.

New trial granted.