BANK OF BOSTON CONNECTICUT, TRUSTEE (ESTATE OF PHEBE WARREN BREWSTER HEALEY) *v.* WILLIAM P. BREWSTER ET AL.

SUPERIOR COURT JUDICIAL DISTRICT OF FILE No. 32518
NEW HAVEN

Memorandum filed September 10, 1992

*Gager & Henry,* for the plaintiff.

*William H. Clendenen,* for the named defendant.

*Brody & Ober* and *Gentile & Chiota,* for the defendant Mary E. Greene et al.

*Thomas M. Fiorentino,* assistant attorney general, for the defendant Richard Blumenthal, attorney general.

*Wiggin & Dana,* for the defendant American Society for the Prevention of Cruelty to Animals et al.

*Robert J. Engelman,* guardian ad litem for undetermined and unborn beneficiaries.

Hon. Arthur H. Healey, State Trial Referee. This will construction proceeding was instituted by the plaintiff Bank of Boston Connecticut, in its capacity as trustee (trustee)[1] under the will of Phebe Warren Brewster Healey (testatrix) against a number of defendants.[2] The trustee seeks in particular the construction of certain language of the testamentary trust (trust) set up by the testatrix in article thirteenth paragraph (B) of her will executed January 12, 1972. All the parties are represented by counsel and have submitted the case to this court on the basis of an executed stipulation of facts to which is attached certain exhibits. The court held a hearing and has also had the benefit of pretrial and posttrial briefs.

## I

The stipulation of facts discloses the following. Article thirteenth of the testatrix' will is the residuary clause. Its preamble states that "all the rest, residue and remainder of my estate, real, personal and mixed, of

[1] The testatrix, a domiciliary of Hamden, executed her will on January 12, 1972, and died on June 19, 1972. On July 17, 1972, the Probate Court for the district of Hamden admitted that will to probate and appointed Attorney William Fox Geenty and Second National Bank of New Haven coexecutors of her estate. Both Geenty and Second National Bank of New Haven were also named cotrustees of a testamentary trust set up under article thirteenth, paragraph (B) of that will. The plaintiff Bank of Boston Connecticut is the successor in interest to Second National Bank of New Haven and has served as sole trustee following the death of Geenty on May 5, 1991.

[2] The defendants include: William P. Brewster, the son of the testatrix; three children of Constance H. Greene, a sister-in-law of the testatrix who died on February 9, 1991; Edith Healey Watts, a living sister-in-law of the testatrix, together with three of her children and eight of her grandchildren; Muriel Healey Oster, a living sister-in-law of the testatrix, together with two of her living children, the executor of the estate of a deceased child, and seven grandchildren of Muriel Healey Oster. Attorney Robert J. Engelman, guardian ad litem for unborn and undetermined defendants having an interest as possible remaindermen of the trust under article thirteenth, is also a defendant as is Richard Blumenthal as attorney general of the state of Connecticut.

any nature whatsoever and wherever situated I give, devise and bequeath as follows . . . ." Article thirteenth is then broken down into paragraphs designated (A), (B) and (C).

Paragraph (A) leaves one half of the residue and remainder of the testatrix' estate to her son, William Patrick Brewster. Brewster was the testatrix' son by her first marriage. Paragraph (A) of article thirteenth states in full the following: "One-half (½) of said residue and remainder of my estate to my son WILLIAM PATRICK BREWSTER, the same to be his absolutely and forever. If my son, WILLIAM PATRICK BREWSTER, shall either predecease me or die within five (5) months after my death, I give, devise and bequeath one-half (½) of the share he would have taken under this Article to the wife of my said son, if any, if she be living at the time of my death, and the other one-half (½) to any children of my said son, WILLIAM PATRICK BREWSTER, living at the time of my death, in equal shares. And, in the event there shall be no such surviving wife of my said son, then the entire share given and bequeathed in this Article shall go to the children of my said son living at the time of my death, in equal shares, or in the event there shall be no surviving children of my said son, then the entire share devised and bequeathed to my said son, shall go to his surviving wife. In the event there shall be no surviving wife or children of my son, then the share of my estate devised and bequeathed to him in this Article, shall be divided equally between the seven (7) charitable institutions named under Article Twelfth in this Will."

Paragraph (B) of article thirteenth states the following: "The other one-half (½) of the rest, residue and remainder of my estate, I give, devise and bequeath

to the SECOND NATIONAL BANK OF NEW HAVEN, a corporation organized and existing under the banking laws of the United States, and having its office and principal place of business in the City and County of New Haven, State of Connecticut, and WILLIAM FOX GEENTY of New Haven, Connecticut, IN TRUST, FOREVER, and for the following purposes and uses described and enumerated in the remaining paragraphs of this Article Thirteenth.

"The Trustees shall pay the entire income from this Trust to the sisters of my late husband, Stanhope B. Healey, MRS. LAWRENCE B. PACKARD, Post Office Box 413, Woods Hole, Massachusetts, MRS. HARRY LEE WATTS, 402 Forty-Ninth Street, Virginia Beach, Virginia, MRS. RICHARD L. GREENE, R.F.D. 2, Box 239 Amherst, Massachusetts, MRS. ROBERT OSTER, 694 Gladstone Avenue, Baltimore, Maryland, in equal shares, during their lifetimes, at least as often as quarter-annually.

"Upon the death of each of the above-named sisters of my late husband, Stanhope B. Healey, the Trustees shall pay one-fourth (¼) of the principal of the Trust created by this Article as it may then exist and any accrued or unpaid income due to said deceased sister, free and discharged of trust to the children of said deceased sister, in equal shares. The children of any deceased child shall take the share of their parent, equally.

"In the event any of the above-named sisters of my late husband, Stanhope B. Healey, shall die, leaving no children or grandchildren surviving her, then the share of the principal of this Trust that said children or grandchildren would have taken shall be divided equally between the seven (7) charitable institutions named under Article Twelfth of this Will."

Paragraph (C)[3] of article thirteenth sets out the rights and duties of the trustees under the trust set up in paragraph (B) of that article.

As to the defendants: The named defendant, William Patrick Brewster (Brewster), is the son of the testatrix by her first marriage, her sole heir at law and a beneficiary under article thirteenth paragraph (A) of the will.

He was alive at the time the testatrix executed the 1972 will and he is still living. All four sisters-in-law

---

[3] Article thirteenth, paragraph (C) provides: "Said Trustees shall hold and manage said fund and the increment thereof during the period of the existence of the herein-stated Trust, with full power to retain existing investments, to sell, exchange, or otherwise dispose of, at public or private sale, all or any part thereof, whether real or personal, either for cash or upon credit and for such prices and upon such terms and conditions as to my said Trustees shall seem proper, and to borrow money and to mortgage or hypothecate said property or any part thereof to secure such borrowings, and to make, execute and deliver all necessary or convenient deeds, conveyances, assignments, mortgages and bills of sale thereof, and such other instruments as shall be necessary or convenient for the purposes hereof; to pay all taxes and charges thereon and to collect the income therefrom, and to retain as principal in said Trust all increases in the value of securities and property held in said Trust, whether or not such increases are realized by sale, exchange or other disposition, and likewise to retain, as part of the principal of said Trust fund, stock dividends and the proceeds of the sale or other disposition of stock dividends and the proceeds of the sale or other disposition of stock rights and to invest and reinvest the principal of this Trust fund in stocks, common or preferred, bonds, securities, businesses owned and operated by partnerships or individuals and other property, real or personal, whether or not the same shall be legal investments for trustees, and said Trustees shall not be liable because of the character of such investments or because of any loss or decrease in the value of the principal by reason of its investment or reinvestment of any part hereof except in the case of willful misconduct or gross negligence on their part. Said Trustees shall have the power to vote any corporate stock belonging to the Trust fund through its representatives or by proxy, with or without power of substitution, to execute proxies to one or more nominees, to exercise any option or privilege to convert bonds, notes, stocks or other securities belonging to the Trust fund into other bonds, notes, stocks or other securities and to exercise any privilege to subscribe for additional or other bonds, notes, stocks or other securities having the power to make such conversions and subscriptions, to make payments therefore, and to

named in paragraph (B) were alive at the time of the death of the testatrix in 1975. On October 30, 1988, Leonore Packard, one of the sisters-in-law died. The Bank of Boston and William Fox Geenty, as cotrustees, according to the stipulation "paid one-fourth of the principal of the Trust as it then existed to Ann P. Horrell, Mrs. Packard's only child." The stipulation also states that: "The value of the principal as it existed on October 30, 1988 equaled $1,124,215.48 and the value of the amount distributed to Ann Horrell equaled $281,053.87."

---

advance or borrow money for the purpose of exercising such option privilege or right. Said Trustees may take part in reorganization sales, mergers, consolidations, foreclosures and liquidations of corporations of which this Trust may hold stock or securities and therein deposit and exchange stocks and securities of the Trust and may deposit stock, bonds and other securities and obligations held by the Trust with protective committees or otherwise to secure payment or adjustment, and may pay assessments or other charges in connection therewith. Said Trustees, as they may deem necessary in the management and protection of the Trust property, and generally in the conduct of the Trust, may retain counsel and attorneys of their own selection and may employ agents, investment counsel, architects, accountants, clerks, bookkeepers, and also labor of any kind. Said Trustees may lease to others land and buildings held by them under this Trust for terms not exceeding ninety-nine (99) years and not terminable at the termination of this Trust, on net or gross rentals or on ground rentals or other proper bases; they may erect buildings and other improvements, repair, improve, alter, rebuild and remove or demolish buildings, lease land and buildings from others for terms not limited to the period of the Trust, and may improve and use and sublet and otherwise dispose of such leaseholds in the manner authorized hereby with respect to other lands and buildings and property held by them under this Trust. Said Trustees shall have the power to determine whether premiums on investments shall be charged against principal or income or apportioned between them, and whether discounts on investments shall be credited to principal or income or apportioned between them; to determine what is income and what is principal hereunder, what expenses, costs, taxes and charges of all kinds shall be charged against income and what against principal; to abandon, adjust, arbitrate, compromise, sue on or defend and otherwise deal with and settle claims in favor of or against the Trust estate, their decision with respect to all such matters to be conclusive upon all parties. Purchasers from the said Trustees or their successors shall not be liable for or required to follow the application or disposition by said Trustees of any sums paid to said Trustees."

Thereafter, on February 9, 1991, a second sister-in-law, Constance H. Greene, died. She left her children, the defendants Mary Elizabeth Greene, Frank L. Greene and Susan G. Richards. No other children were born to or adopted by Constance H. Greene.

A third sister-in-law, Edith Healey Watts (Mrs. Harvey Leebatts), is also a defendant. Her children, Harry Lee Watts III, Constance W. Krucke and Virginia W. Fournier, are also defendants; she had no other children either by birth or adoption. Edith's grandchildren, Letitia Watts, Alison L. Watts, Carl W. Krucke, Kurt W. Krucke, John B. Krucke, Paul H. Fournier, Ann M. Fournier and Emily Page Fournier, are also defendants.

A fourth sister-in-law, Muriel Healey Oster (Mrs. Robert H. Oster), is also a defendant as are Judith O. Cushman and Robert Rush Oster. The defendant Margo Wittich, is the executrix of the estate of Jon O. Oster, the deceased child of Muriel Healey Oster. No other children were born to or adopted by Muriel Healey Oster; Muriel's grandchildren, Brooke Blackburn Cushman, formerly known as Brooke Cushman Sullivan, Jonathan Walker Cushman, Stewart Wakeley Cushman, Christopher Rush Oster, Keith Edward Oster, Robert Nelson Oster and Lawrence Franklin Oster are also defendants.

Attorney Robert J. Engelman of New Haven has been appointed guardian ad litem for those defendants who are unborn and undetermined who have an interest in this matter as possible remaindermen under the trust created by article thirteenth. His appointment in that capacity was consented to by all appearing defendants.

Seven charitable beneficiaries,[4] each of which takes specific bequests under article twelfth of the will and

---

[4] The seven charitable beneficiaries named under article twelfth are: "Parish of Trinity Church (also known as Trinity Church on the Green); the Connecticut Junior Republic Association, Inc.; the American National Red Cross;

who are contingent remaindermen of the trust shares "devised" to the children of the sisters-in-law of the testatrix under article thirteenth have also been made defendants.

The defendant Richard Blumenthal is attorney general of the state of Connecticut.

As noted, on February 9, 1991, a second sister-in-law, Constance H. Greene, died leaving her children Mary Elizabeth Greene, Frank L. Greene and Susan L. Richards. On March 28, 1991, the trustees filed with the Probate Court for the district of Hamden an accounting (1991 accounting) of their actions for the period of January 1, 1990 to February 9, 1991. A copy of that 1991 accounting is attached to the stipulation of facts. Suffice it to say at this point that the 1991 accounting did state that "Mrs. Richardson L. Greene died February 9, 1991 and one-third of the market value of this trust is to be distributed to Mary Elizabeth Greene, Frank L. Greene and Susan G. Richards."

On April 26, 1991, Brewster filed an objection to this 1991 accounting with the Probate Court for the district of Hamden. A copy of this objection is attached to the stipulation of facts. In that objection, Brewster urged that the Hamden Probate Court reject the trustees proposed 1991 accounting and distribution because "it is contrary to the terms of Article Thirteenth." In doing so, he pointed out that the following portion of paragraph (B) of article thirteenth "provides in pertinent part" as follows: "Upon the death of each of the above-named sisters-in-law of my late husband, Stanhope B. Healey, the trustees shall pay *one-fourth (¼)*

the American Society for the Prevention of Cruelty to Animals; the Children's Center (formerly known as the New Haven Orphan Asylum); the Newington Children's Hospital (formerly known as the Newington Home and Hospital for Crippled Children) and Saint Francis Hospital, Inc."

*of the principal of the trust created by this Article as it may then exist* and any accrual or unpaid income due to said deceased sister free and discharged of trust to the children of said deceased sister, in equal shares." (Emphasis added.) Brewster's objection further stated: "The trustees, in contradiction of the express language of the Trust, propose to pay one-third of the market value of the trust to the three children of Mrs. Richardson L. Greene in equal $^1/_9$th shares respectively." Although acknowledging that the trustees "have been endowed with numerous powers to hold and manage the trust assets" he argued that "they have not been authorized or empowered to alter the express directives of the distribution provisions." He then requested that court to "reject the proposed account and order the trustees to file a new account and distribution."

The hearing on the 1991 accounting scheduled for May 1, 1991, was continued to May 15, 1991. The judge of probate for the probate district of Hamden has withheld a determination upon the 1991 accounting while this suit to construe the will is pending.

The parties have also stipulated that: "The plaintiff cannot with safety to itself or the rights and interests of the other parties carry out its duties as Trustee and distribute the Trust estate unless this Court construes the will and advises the Trustee as to its conduct."

II

The trustee takes no position in this proceeding because, it indicates, it is a "rule" of our Supreme Court that, if all interested parties are represented by counsel as they are here, a trustee should not take a position. In doing so, this trustee cites *Hershatter* v. *Colonial Trust Co.*, 136 Conn. 588, 73 A.2d 97 (1950).

The other parties make a number of claims that will be examined later. Among Brewster's claims are the following. The testratrix' will, and particularly article thirteenth, paragraph (B), is clear and unambiguous and, in construing this will, the court must give effect to the words used by the testatrix. In construing the will, claims Brewster, the court "is not free to disregard the mathematical divisions of the trust principal which Mrs. Healey set forth in her will" and may not increase the shares to go to the families of her sisters-in-law. The court cannot, Brewster further maintains, rewrite the will and may not supply a dispositive provision that was omitted. The will's provisions, as written, must be given effect even though they may lead to a partial intestacy. The presumption against intestacy does not permit, he also contends, "reformation" of this will. He argues that the presumption against intestacy does not apply because the "particular provision in question," i.e., article thirteenth paragraph (B), is not fairly open to two constructions as article thirteenth is "clear and unambiguous." Nor, he continues, does the testatrix' testamentary scheme "override the particular provisions of Article Thirteenth, Paragraph (B)." Brewster also points to Connecticut case law refusing to admit "extrinsic evidence" to "correct or vary the unambiguous terms of wills" but says that while the other defendants "do not seek directly to introduce extrinsic evidence, they do seek to substitute their distribution scheme for Mrs. Healey's instructions." In urging his claims as to the rules of construction to be applied, he emphasizes the vital public policy to be served by doing so, including the preservation of the statute of wills. General Statutes § 45a-251.[5]

---

[5] General Statutes § 45a-251 provides: "MAKING AND EXECUTION OF WILLS. WILLS EXECUTED OUTSIDE THE STATE. A will or codicil shall not be valid to pass any property unless it is in writing, subscribed by the testator and attested by two witnesses, each of them subscribing in the testator's

Brewster's ultimate claim is that this court should "advise the [trustee] to pay one-fourth of the principal of the trust as it existed on February 9, 1991 to the children of Constance H. Greene; one-fourth of the Trust principal as it exists upon the death of the third sister-in-law to her children or grandchildren or to the charities; and one-fourth of the trust principal as it exists upon the death of the last sister-in-law to her children or grandchildren or to the charities. The remainder of the Trust is intestate property."

On the other hand, the defendants[6] make claims involving the following which will be discussed later. Collectively, the defendants contend as follows. The terms of article thirteenth, paragraph (B), when read in isolation, are "ambiguous as to the fractional interest to be distributed upon the successive deaths of the testatrix' four sisters-in-law" but "when the will is read as a whole, the testatrix' interest is clear." Although claiming that the language of that part of paragraph (B), is "inartful" that does not prevent, they claim, the court from ascertaining the wishes of the testatrix where there is a plausible construction which disposes of her entire estate consistent with her intent. It is also maintained that no portion of her estate passes by intestacy as the testatrix intended to die testate as is evidenced by the overall scheme of her will including the use of a residuary clause and that plausible construction avoids intestacy keeping in mind the presumption against intestacy. The testatrix' testamentary scheme, the defendants further contend, evidences an

presence; but any will executed according to the laws of the state or country where it was executed may be admitted to probate in this state and shall be effectual to pass any property of the testator situated in this state."

[6] The claims set out here include those made by all the defendants through their particular counsel. No attempt is made to separate them as made by any particular counsel. Essentially, all the defendants join in the claims made and urge the same construction of the will, and particularly that of article thirteenth, paragraph (B).

intent to treat all her sisters-in-law and their children and her grandchildren equally and the residuary clause in article thirteenth, paragraph (B), should be construed in a way that promotes that equality. The claim is also made that the evident intent of the testatrix to treat her sisters-in-law equally abruptly ends, they say, under Brewster's claims when one reaches article thirteenth, paragraph (B). Reading the will as a whole, the defendants argue that it can be found that it was the testatrix' intent that each sister-in-law's children or grandchildren receive a one-fourth share of the original trust principal in whatever form such share existed at the time of each sister-in-law's death. This construction, it is further claimed, can be gleaned from the will without doing violence to the words used in the will or "rewriting" it. It is also argued that the language used to dispose of the accrued income is consistent with their claim that the testatrix' use of the word "one-fourth" referred to the original principal and not to the remaining principal. They oppose any construction that "one-fourth" as used in article thirteenth, paragraph (B), should be such, as Brewster they claim maintains, to require a "diminishing share" to the children as each successive sister-in-law dies. In so arguing, the defendants refer to authority from outside Connecticut to the effect that some courts have gone so far as to reject mathematical percentages where the court determines that the testator intended to treat beneficiaries equally. At this point, it should be said that this court does not intend to rely on any authority outside of Connecticut in resolving any such claim. The defendants also contend that the construction they advocate is supported by the accounting objected to by Brewster, pointing out that Geenty, who admittedly drafted this will, understood what the testatrix meant by the words she used.

The defendants' (other than Brewster) ultimate claim is that "One-third of the remaining trust principal and

one-third of any accrued or unpaid income be distributed to the children of the late Constance H. Greene in equal shares; that one-half of the trust principal remaining at the death of the third sister-in-law and one-half of any accrued or unpaid income be distributed to the then-living children of said deceased sister-in-law in equal shares and to the children of any predeceased child equally and all of the trust principal remaining at the death of the last sister-in-law together with all accrued or unpaid income be distributed to the then-living children of that deceased sister-in-law in equal shares and to the children of any predeceased child equally.'' This court understands that this claim assumes that their arguments as to how the language involved should be construed is accepted by the court.

## III

Initially, it is appropriate to set out certain general principles. "The construction of a will presents a question of law to be determined in light of the facts which are found by the trial court or are undisputed or indisputable. . . . *Hershatter* v. *Colonial Trust Co.,* [supra, 596]." (Citations omitted; internal quotation marks omitted.) *Connecticut National Bank & Trust Co.* v. *Chadwick,* 217 Conn. 260, 266, 585 A.2d 1189 (1991). " 'The cardinal rule to be followed in construing a will is to find and effectuate the intent of the testator. In seeking that intent, the court looks first to the will itself and examines the words and language used in the light of the circumstances under which the will was written. . . . To ascertain the intent of a particular provision, the will must be read as a whole to discover whether it discloses an underlying intent which should be considered in finding the meaning to be accorded to the particular language under construction.' " (Citations omitted.) *Dei Cas* v. *Mayfield,* 199 Conn. 569, 572, 508 A.2d 435 (1986); *Hartford National Bank & Trust Co.* v. *Devitt,* 145 Conn. 384, 388, 143

A.2d 441 (1958). In searching for the testatrix' intent "we look first to the precise wording employed by the testatrix in her will . . . for the meaning of the words as used by the testatrix is the equivalent of her legal intention—the intention that the law recognizes as dispositive. . . ." *Canaan National Bank* v. *Peters,* 217 Conn. 330, 335–36, 586 A.2d 562 (1991). " 'The question is not what [s]he meant to say, but what is meant by what [s]he did say.' *Connecticut Junior Republic* v. *Sharon Hospital,* 188 Conn. 1, 20, 448 A.2d 190 (1982) . . . ." *Canaan National Bank* v. *Peters,* supra, 336. "The words used by the testatrix are to be interpreted according to their ordinary mearning unless the context or circumstances indicate a different meaning." *Carr* v. *Huber,* 18 Conn. App. 150, 155, 557 A.2d 548 (1989). "The meaning of the words used by the testatrix in the [particular portion of her will in question] is not to be deduced by extracting and examining the words in artificial isolation. . . . The words must be interpreted in light of their context within the [particular portion in question] and with reference to the will in its entirety. . . . Not only must all parts of the will be considered, but each and all its provisions should, so far as possible, be harmonized and given effect." (Citations omitted; internal quotation marks omitted.) *Canaan National Bank* v. *Peters,* supra, 336. Of course, " '[a] court may not stray beyond the four corners of the will where the terms of the will are clear and unambiguous.' " Id., 337. An interpretation that requires that a will be rewritten cannot be accepted because "[t]he power of a court is limited to an interpretation of the language used by the testator . . ." and while a court may construe a will it is "powerless to construct one." *Hoenig* v. *Lubetkin,* 137 Conn. 516, 523–24, 79 A.2d 278 (1951); *Smerda* v. *Smerda,* 153 Conn. 430, 432, 217 A.2d 59 (1966).

The parties have urged that their views of our state's case law be applied to the present case by the court to support their positions. In that regard, the court notes that our case law has said that "[i]n the field of testamentary construction, precedents are usually inconclusive, since the same or substantially similar expressions seldom occur in different wills. *Browan* v. *Potter,* 114 Conn. 441, 445, 159 A. 275 [1932]. Precedents are entitled to little weight where they do not involve precisely analogous testamentary language, used by testators surrounded by like circumstances at the execution of their wills. *Gilman* v. *Gilman,* 99 Conn. 598, 613, 122 A. 386 [1923]; *Hartford Trust Co.* v. *Wolcott,* 85 Conn. 134, 138, 81 A. 1057 [1912]; *Russell* v. *Hartley,* 83 Conn. 654, 660, 78 A. 320 [1910]. Each will must ordinarily stand by itself. *Cumming* v. *Pendleton,* 112 Conn. 569, 574, 153 A. 175 [1931]." *Hartford National Bank & Trust Co.* v. *Harvey,* 143 Conn. 233, 243, 121 A.2d 276 (1956); *Hartford National Bank & Trust Co.* v. *Thrall,* 184 Conn. 497, 507–508, 440 A.2d 200 (1981). As Page states in his treatise: "While precedents are of some weight in aiding construction, they have not the controlling force that they have in most branches of law since a slight difference in the language which [a] testator uses may make a great difference in his intention." 4 W. Page, Wills (Bowe-Parker Rev. 1961) § 30.5, pp. 23–24; see also *Collister* v. *Fassitt,* 163 N.Y. 281, 286, 57 N.E. 490 (1900) ("no will has a brother").

IV

Keeping in mind that the testatrix' intent is the polestar, this court begins its analysis to determine her intent with a consideration of all the language contained within the four corners of her will containing seventeen articles. Upon so doing, there emerges her general testamentary scheme bearing upon the ultimate issue and in the course of which she made certain

devises and bequests to specific individuals and charities.[7] In article fourth she gave her real estate on Old Farm Road in Hamden together with the personal property therein to her four sisters-in-law "in equal shares" or if "any of them" predeceased her or died within five months after death, "then to their children, *per stirpes*." That article also provided that if any of the four sisters-in-law "above mentioned" predeceased her or died within five months after her death "leaving no children surviving, then said share shall go to said surviving [sisters-in-law], equally, but if only one of the above-named [sisters-in-law] shall survive [the testatrix] the whole thereof to such survivor." It is submitted that she intended that each said sister-in-law who so survived her was to take an equal share under article fourth.

Article seventh disposed of the testatrix' jewelry and wearing apparel, which she bequeathed to her four sisters-in-law and one other named person, "in equal shares." She also included in this article the same proviso as in article fourth concerning the legatees surviving her as well as who takes on the death of any down to the last survivor of those five legatees.

---

[7] The seventeen articles in the will essentially were as follows: Article first set up a trust concerning the care of her grave in Troy, New York; article second contained the testatrix' directions concerning the payment of taxes assessed against her estate; article third stated that this will was made in contemplation of her marriage to one McNulty and points out that that marriage is subject to an antenuptial agreement executed in November, 1971, which limits McNulty's eligibility to share in her estate as well as she in his estate; articles fifth, eighth, ninth, tenth and eleventh contain specific bequests to various individuals (none of whom is one of her four sisters-in-law named elsewhere in the will); article sixth devises real estate in Troy, New York, together with its contents to a private school in that city; article twelfth made specific bequests to seven charities (which themselves are contingent remaindermen under article thirteenth); article fourteenth defines the word "children" as used in the will to include legally adopted children; article fifteenth gives certain powers to the executor and trustees; article sixteenth concerns fees for the trustees and article seventeenth concerns the naming of her executors.

Article thirteenth, and specifically paragraph (B), which is the portion directly in issue, has been already set out. It is enough to say at this point that the testatrix' treatment of her four sisters-in-law equally is clear in the trust under paragraph (B) of article thirteenth both as to income and principal. Paragraph (C) of article thirteenth, of which more will also be said, sets out certain rights and duties under the trust created under article fourteenth.

Initially, where a will has been executed, the reasonable presumption is that the testator intends to dispose completely of his entire estate. *Stinson* v. *Palmer,* 146 Conn. 335, 337, 150 A.2d 600 (1959); see also 80 Am. Jur. 2d Wills § 1175 (1975); 4 W. Page, supra, § 36.14. This will, drafted by an experienced attorney, definitely suggests, to say the least, the testatrix' overall intent to dispose of her entire estate. Up to article thirteenth, which is the residuary clause, the preceding articles concerned all the specific dispositive legacies and devises she made in the will. Prior to that article the only specific devisees and legatees who appear to be "family members" that are referred to are her four sisters-in-law, the sisters of her late husband Stanhope B. Healey. Her son, Brewster, is not mentioned until article thirteenth and that is the only place in the will in which he is mentioned. Her four sisters-in-law, however, are mentioned in articles fourth and seventh, and, as indicated above, as taking the devise and bequest given them under each of those articles "in equal shares." When, however, article thirteenth, the residuary clause, is examined, the issue is joined by Brewster on the one side and all the remaining defendants on the other as to its construction in this will.

Up to article thirteenth the testatrix, at length and with care, has made all her specific dispositive provisions. Article thirteenth sets out a "studied effort"; *Ministers Benefit Board* v. *Meriden Trust Co.,* 139

Conn. 435, 446, 94 A.2d 917 (1953); to make an inclusive scheme pointed to disposing of all of her residuary estate. "The fact that the will itself contained a general residuary clause, shows in itself an intent to avoid partial intestacy." *Hartford-Aetna National Bank* v. *Weaver,* 106 Conn. 137, 142, 137 A. 388 (1927). It has been said that by the use of a general residuary clause, the testator "obviously sought to avoid any intestacy." *Ministers Benefit Board* v. *Meriden Trust Co.,* supra, 497. Here, it appears that the testatrix certainly intended to dispose of the entire residue of her estate. To begin with, the preamble to paragraphs (A) and (B) of article thirteenth refers to that intent in all-inclusive global terms when it states: "All the rest, residue and remainder of my estate, real, personal and mixed, of any nature whatsoever and wherever situated I give, devise and bequeath as follows." Paragraph (A) of that article provides that: "*One-half (½) of said residue and remainder of my estate* to my son WILLIAM PATRICK BREWSTER, the same to be his absolutely and forever. . . ." (Emphasis added.) Paragraph (B), then provides: "*The other one-half (½) of the rest, residue and remainder*" is given in trust to pay the income and principal as therein directed to the testatrix' four sisters-in-law. (Emphasis added.) Here, she has provided that not "one-half (½)" but "the *other* one-half (½)," having already directed that one-half go to her son. (Emphasis added.) So, to this point the will clearly demonstrates that one-half of her residuary estate goes to Brewster and the other one-half to her four sisters-in-law.

One cannot reasonably read this will without gleaning from the provisions that the testatrix strove to articulate her intention to keep the two halves of her residuary estate in paragraphs (A) and (B) clearly separate. In that regard, in addition to what has already been said, there are no crossover devises or bequests

between her son on the one hand and those who would take through him and the testatrix' four sisters-in-law on the other hand and those who would take through them. In the event of the failure, under paragraph (A), of anyone designated therein to take in accordance, with that paragraph, the "one-half" of the residuary there involved would not go by intestacy or to anyone eligible to take under paragraph (B) but rather under article seventh to the charities named there. Likewise, in the event of the failure under paragraph (B) of anyone designated therein to take "the other one-half (½)" that would not go by intestacy, nor to anyone eligible to take under paragraph (A) but again it would pass under article seventh to the charities named therein. Moreover, in paragraph (B), the testatrix, as further indication of her intent to direct the devolution of that half of her residuary estate, provided that upon the death of a sister-in-law "any accrued or unpaid income due to said deceased sister" was to be paid "free and discharged of trust to the children of said deceased sister in equal shares . . . ." This further evidences her intent of compartmentalizing the devolution of the disposition of each half of her residuary estate.

Her will on its face evinces the intent, insofar as article thirteenth is concerned, and particularly paragraph (B) of that article, of treating her four sisters-in-law equally and to insulate the one-half of the residue given them and their progeny not only from any intestacy but articulating that any failure of them to take as provided is to go only to the charities named in article twelfth. This is complemented by the evident intent to treat her son equally as she does under paragraph (A), where she gives him one-half of the residue of her estate and likewise compartmentalizing the devolution of the one-half in paragraph (A).

Although, however, "a testator clearly intends to dispose of his entire estate, 'a construction required by

the terms of a will cannot be avoided because it leads to intestacy in whole or in part.' *Wolfe* v. *Hatheway,* 81 Conn. 181, 186, 70 Atl. 645 [1908] . . . .'' *Willis* v. *Hendry,* 130 Conn. 427, 437–38, 35 A.2d 207 (1943). A construction of a will is favored that will avoid intestacy and, while a presumption to that end must be entertained, i.e., that he did not intend intestacy as to any part of his estate, a court cannot rewrite the will of a testator to avoid any such intestacy. *Hartford National Bank & Trust* v. *Yearly Meeting,* 137 Conn. 648, 654, 81 A.2d 104 (1951). Again, "[a] construction plainly required by the terms of the will cannot be avoided because it leads to intestacy. *Morehouse* v. *Bridgeport Trust Co.,* 137 Conn. 209, 216, 75 A.2d 493 (1950).'' *Colonial Bank & Trust Co.* v. *Stevens,* 164 Conn. 31, 41, 316 A.2d 768 (1972).

Brewster contends that the presumption against intestacy does not apply because the "particular provision in question," i.e., article thirteenth, paragraph (B), is not fairly open to two constructions as article thirteenth is clear and unambiguous. Brewster argues that the language "one-quarter of the principal . . . then exist" has, as its triggering determinant, the date of the death of a particular sister-in-law. This is the date that, according to him, controls the determination in dollars of what constitutes her "one-quarter of the principal . . . then exist." Therefore, he contends, that the "trustee shall pay one-quarter of the principal of the trust as it exists when a particular sister dies to the sister's children, grandchildren or charity as appropriate under the Article." In any event, he also argues that the testatrix' testamentary scheme cannot be said to "override the particular provisions of Article Thirteenth, Paragraph (B)." From what the court has said to this point of the evidence of the testatrix' intent, the position Brewster takes requires that, upon reaching article thirteenth and particularly paragraph (B),

that that portion of the will be read with the consequence of a partial intestacy, in which event he would take as his mother's heir at law. This court does not agree.

The intent of the testatrix to preclude an unintended intestacy is readily discernible from the whole will and article thirteenth. It is quite arguable, as the defendants claim and as the court agrees, that the language employed in paragraph (B) is "inartful" in expressing the intent in paragraph (B), but that intent is reasonably clear under the whole will including article thirteenth. See *Wolfe* v. *Hatheway,* supra, 185; *Hurd, Trustee* v. *Shelton,* 64 Conn. 496, 498, 30 A. 766 (1894). The language involved does create doubt and is unclear in light of the entire will.

This situation, however, presents a circumstance allowing the application of the rule that a will is to be construed to avoid intestacy as to any part of the estate where the particular provision in question is "fairly open to two constructions." *Willis* v. *Hendry,* supra, 438; *Colonial Bank & Trust Co.* v. *Stevens,* supra, 38. Where the will involved is susceptible of two constructions, one of which will dispose of the whole of the estate as opposed to disposing of part of it by intestacy, "the courts will prefer the construction by which the whole of the testator's estate is disposed of, if this construction is reasonable and consistent with the general scope and provisions of the will." *Allen* v. *Tyson,* 133 Conn. 699, 703–704, 54 A.2d 490 (1947); see *White* v. *Smith,* 87 Conn. 663, 673, 89 A. 272 (1914).

The trust created by paragraph (B) was intended to dispose of the "other one-half" of the testatrix' residuary estate. In executing her will the testratrix provided in article thirteenth, paragraph (B), that "upon the death of each [of her four sisters-in-law] . . . the trustees shall pay one-fourth (¼) of the principal of the trust created by

this Article [thirteenth] as it may then exist and any accrued or unpaid income due to said deceased [sister-in-law], free and discharged of Trust to the children of said deceased [sister-in-law] in equal shares. The children of any deceased child shall take the share of their parent, equally. . . ." She stated that this "shall" be done "upon the death of each [of the four sisters-in-law]. . . ." Brewster argues, therefore, that the date of death of each sister-in-law and, not the date of the testatrix' death, was the time when the "one-quarter (¼) of the principal of the trust created by this Article as it may then exist" was to be determined.

It bears repeating here that the meaning of words used by a testatrix in a particular paragraph is not to be deduced by extracting and examining them in artificial isolation, but must be interpreted in light of their context within this paragraph, this particular article thirteenth and with reference to the will in its entirety. *Canaan National Bank* v. *Peters,* supra, 336. This court cannot accept Brewster's claims under the circumstances including the deliberate testamentary scheme referred to, the clear indication to dispose of all of her estate, the articulated language evidencing the intent for equality of treatment, each of which finds support in paragraph (B), and the fair reading of the language involved in the light of the entire will. The weight of authority is to the effect that a will speaks as of the death of the testator unless there is something in the will to indicate a contrary intention, but the court recognizes, that a testator may, by use of suitable language in the will, show that his will deals with things, persons and the like as they existed at some time other than his death. 4 W. Page, supra, § 30.26, see, e.g., *Mead* v. *Close,* 115 Conn. 443, 444, 161 A. 799 (1932); *Clark* v. *Hartford-Conn. Trust Co.,* 127 Conn. 101, 14 A.2d 743 (1940). The language used does not fairly lend itself to that view here. In stating her intent, she spoke

to the trust created by her in paragraph (B). She provided that her trustees were to pay one-quarter of that trust "upon the death of *each* . . . ." (Emphasis added.) Given her evident demonstration here, in paragraph (B), and elsewhere to treat her four sisters-in-law equally, she intended "one-fourth (¼)" in paragraph (B), to mean one-fourth of the original trust corpus as that existed at the time the trust was created and not one-fourth of the trust principal as that existed at the time each sister-in-law died. The "one-fourth" so intended was the equal share she intended that each of the four "lines" claiming through each of the four sisters-in-law were to take. This equal share, i.e., one-fourth of the original trust corpus, remained constant throughout. Nor is the "as it may then exist" language intended to change that. As stated, the "one-fourth" remained constant, it was the testatrix' expression of that portion or fraction of the whole of the original trust corpus the four "lines" (each claiming through a particular sister-in-law) was to partake, to share, to have a portion of. The "as it may then exist" in context refers to the date of distribution of any one of the "one-fourth" as delineated above. It has been said that the word "then" when used in a testament may be used to express a time or to designate an event and that it is more usually used in the latter sense. *Chase National Bank* v. *Guthrie,* 139 Conn. 178, 183, 90 A.2d 643 (1952). The context of its use determines how it is used. Here, however, it actually does not make any real difference. It is apparent as to the word "then" that, in this article of her will, the testatrix knew how to express her intent as to when the quantum of her benefaction in dollars as to each holder(s) of the earlier given one-fourth share of the original trust corpus was to be determined. The date of payment of the one-fourth, it is agreed, was triggered by the death of each sister-in-law. Thus, the language "as it may then exist"

refers to the date of each sister-in-law's death as that time at which the testatrix intended that the dollar amount (be it in real or personal property or both), of the one-fourth share of the original trust corpus, be determined for distribution purposes. Obviously, in demonstrating her intention to treat each line equally, she anticipated reasonably that what might constitute that one-fourth in the original trust corpus share in terms of dollars might well change over time and that the one-fourth as given was her expressed way of achieving that equality among her four sisters-in-law and of disposing entirely of "the other half" of the residue having already done so with the first one-half under article thirteenth, paragraph (A) to her son. That this was her intent, this court submits, follows from what it has already said. In addition, this conclusion finds further support in the powers given to her trustees in paragraph (C) of the very same article thirteenth. Not only are they to hold and manage this trust fund but also to "increment" it during its "existence," they also have "full power" to keep "existing" investments as well as to "sell, exchange, or otherwise dispose of . . . all or any part thereof. . . ." They are also authorized "to retain as principal in said trust all increases in the value of securities and property" no matter how realized and "to invest and reinvest the principal of this Trust in stocks . . . bonds, securities . . . as well as in real property or other personalty." The point here is two fold: First, she clearly intended to give her testamentary trustees broad fiduciary powers in preserving and in increasing the original corpus of the trust she created; second, in so doing, she demonstrated her contemplation that the original trust corpus could, and probably would, change in dollar value, over the existence of the trust; i.e., the lifetimes of her four sisters-in-law. She, however, had already made it apparent by the words she used that she intended equality to be

her dominant object in the benefactions made by the testamentary dispositions in the matter of her late husband's four sisters in her will, and particularly so in article thirteenth. Moreover, this court's construction also requires overruling an anomaly that would exist if Brewster's claims as to the construction of paragraph (B) of article thirteenth were accepted. Had this court accepted that claim, it would mean that the Constance Greene "line" claiming under her death on February 9, 1991, would take only one-fourth of the principal on the trust as it existed on the date of her death but also would take one-third of any accrued or unpaid income—both under article thirteenth, paragraph (B).

The court's construction is not a rewriting of this will. The fractional interest, i.e., "one-fourth (¼)" of the "other one-half (½)" she gave in trust that she articulated and intended that each of her four sisters-in-law were to have has not been changed or rewritten by this court. The first one-fourth has already been paid by her trustees under the article fourteenth trust. This leaves on the death of Constance Greene, "three-fourths" or "three-quarters." "One-third" of what is left, i.e., "three-quarters" or "three-fourths" equals, expressed in fractions, "one-fourth" or "one-quarter" of the original "other one-half" given in trust under article thirteenth paragraph (B).

The "one-third" that the trustees asked the Hamden Probate Court to approve in the 1991 accounting for distribution because of the death of Greene is "one-fourth" of the trust as the testatrix intended it be distributed. The "one-third" language in the 1991 accounting is in accord with that intent and should be so recognized. That, in turn, leaves "one-half" remaining or two "one-fourths" available for distribution, one upon the death of the third sister-in-law and the remaining one upon the death of the fourth sister-in-law. In that fashion, the testatrix' intent to treat each of her

four sisters-in-law equally is effectuated in accordance with the will. This, the court submits, is not rewriting her will. It is not filling a gap or omission of the language providing fully for her intended disposition by will as was the situation in *Willis* v. *Hendry,* supra, 427. Rather, it effectuates her articulated intent. The statute of wills in General Statutes § 45a-251 and the policy behind it are not subverted by this construction of the will.

This court has not overlooked in its construction Brewster's claim that the general testamentary scheme of this testatrix, as the other defendants claim it to be, cannot override the particular provisions of article thirteenth paragraph (B), as he claims them to be. As has already been pointed out, the court is confined to the testator's intent "which finds expression in the wording of the will." See, e.g., *Meriden Trust & Safe Deposit Co.* v. *Spenar,* 127 Conn. 261, 264, 16 A.2d 349 (1940); see also *Rogers* v. *English,* 130 Conn. 332, 339, 33 A.2d 540 (1943). This court's construction finds support in the general intent from a reading of the entire will as to the testatrix' four sisters-in-law. In *Hershatter* v. *Colonial Trust Co.,* supra, it was stated: "This is a consideration to which we may resort in determining the meaning to be accorded ambiguous language . . . . Provisions in a will evidencing a general intent may never explain away the expression of a particular intent. *Willis* v. *Hendry,* [supra,] 437; *Connecticut Trust & Safe Deposit Co.* v. *Hollister,* 74 Conn. 228, 233, 50 A. 750 [1901]. But they may be of great weight in clarifying what is of doubtful meaning." *Hershatter* v. *Colonial Trust Co.,* supra, 593. In view of what the court has already determined, whatever doubt may be said to exist in the specific provision concerned in article fourteenth, paragraph (B), the interpretation it has accorded that language is, this court submits, a "reasonable and natural one under the circumstances." See

id. This court does not believe that its interpretation constitutes the rejection at all of the view that "[p]rovisions in a will evidencing a general intent may never explain away the expression of a particular intent." Id. *Willis* v. *Hendry,* supra, 437, specifically stated in this regard: "A general intent can prevail only 'if the will can fairly be so read, considered as a whole.' " Quoting *Walsh* v. *McCutcheon,* 71 Conn. 283, 286, 41 A. 813 (1898). Actually, the specific intent of the language in question in article fourteenth, paragraph (B), as the court has construed it, demonstrates fairly the intent on which it bases its construction read in the light of the entire will.

In accordance with the foregoing, the trustee under the will of the testratrix in article thirteenth paragraph (B), is advised: (1) That it may distribute one-third (⅓) of the remaining trust principal and one-third (⅓) of any accrued or unpaid income to the children of the testatrix' late sister-in-law, Constance H. Greene, in equal shares; (2) that upon the death of the third sister-in-law of the testatrix, it may distribute one-half (½) of the trust principal remaining at her death and one-half (½) of any accrued or unpaid income to the then-living children of that third sister-in-law in equal shares. If, upon the death of said third sister-in-law, any child of hers has predeceased her leaving any child or children, the trustee may distribute to such child or children their deceased parent's share equally; and (3) that upon the death of the fourth (and last) sister-in-law, it may distribute all of the trust principal remaining upon the death of said fourth sister-in-law together with all accrued and unpaid income to the then living children of said fourth sister-in-law in equal shares. If, upon the death of said fourth sister-in-law, any child of hers has predeceased her leaving any child or children, the trustee may distribute to such child or children their deceased parent's share equally.

## V

Counsel have also filed requests for counsel fees and expenses,[8] under General Statutes § 52-251.[9] The guardian ad litem who had been appointed by the Superior Court to represent the interests of unborn and undetermined remaindermen of the trust established pursuant to article thirteenth, paragraph (B), of the testatrix' will has filed his application for allowance for his services and disbursements under General Statutes § 45a-132 (g).[10] The requests for these attorney's fees and expenses are to be determined at this time. See *Hartford National Bank & Trust Co.* v. *Von Ziegesar,* 154 Conn. 352, 362–63, 225 A.2d 811 (1966). After the trial in this matter of the will construction, the court held a hearing on these requests. At that hearing, affidavits itemizing services and expenses were before the court. There was no testimony of any sort offered and each counsel was heard. These materials, combined with the court's own general knowledge in such matters, serve as the basis for the court to decide, along with the applicable law, the issue as to the amount of expenses and counsel fees to be awarded as to each counsel's request. See generally *Appliances Inc.* v. *Yost,*

[8] Neither the office of the state attorney general nor counsel for the trustee has filed a request for expenses and counsel fees.

[9] General Statutes § 52-251 provides: "EXPENSES AND COUNSEL FEES IN ACTION TO CONSTRUE WILL OR FOR ADVICE CONCERNING WILL OR TRUST. In any action brought to a court of equitable jurisdiction for the construction of a will or for the advice of the court as to the administration of an estate or trust under a will or trust instrument, by any person acting in a fiduciary capacity thereunder, there shall be allowed to each of the parties to the proceeding such reasonable sum for expenses and counsel fees as the court, in its discretion, deems equitable. The allowance shall be taxed as costs in the action, to be paid out of the estate."

[10] General Statutes § 45a-132 (g) provides in relevant part: "Any guardian ad litem appointed under the provisions of this section may be allowed reasonable compensation by the judge . . . appointing him and shall be paid as a part of the expenses of administration."

186 Conn. 673, 681, 443 A.2d 486 (1982). The court at this hearing was informed at some length of the times expended on behalf of each counsel's clients and of their efforts in the preparation of this construction case. The court is aware, of course, of the activities of counsel during the actual trial on May 14, 1992, which was conducted upon the basis of an agreed stipulation of facts. There was comprehensive pretrial and posttrial briefing in the present case. The issue as presented, arising as it appears initially from Brewster's objection the trustee's 1991 proposed accounting filed in the Hamden Probate Court, represented an honest and genuine difference of opinion as to the import of the language of the will as it has already been fully set out.

In brief form, more fully discussed below, the court observes that the requests for counsel fees and expenses under § 52-251 are as follows. (1) The Greene request: Attorney William J. Britt—31.2 hours @ $185 per hour = $5722; Attorney Barbara Miller—77.6 hours @ $160 per hour = $12,416; Attorney Anne Ragusa—289.2 hours @ $20 per hour = $5784; plus costs of $363.24, for a total of $24,335.24.

(2) The James Brewster request: Attorney William H. Clendenen, Jr.—50.5 hours @ $225 per hour = $11,362.50; Attorney James E. Clifford—9 hours @ $150 per hour = $1350; Attorney Nancy Walker—80.1 hours @ $150 per hour = $12,015; Independent contractor Janet O. Marlowe—2.2 hours @ $40 per hour = $88; Legal assistant Lynne M. Tourville—1.9 hours @ $40 per hour = $76; plus photocopy and postage costs of $54.03, for a total of $24,945.53.

(3) The Charities request: Attorney David P. Faulkner—11.94 hours @ $225 per hour = $2686.50; Attorney Phyllis M. Pari—7.8 hours @ $95 per hour = $712.50; Legal assistant Elizabeth Baechler Warren—2.66 hours @ $70 per hour = $186.20; plus dis-

bursements (telephone) of $1.64, for a total of $3586.84. The affidavit in support of the request states: "Counsel Fees and Expenses Total $2205.28."

(4) The request for the services of the guardian ad litem, Robert E. Engelman, under § 45a-132 (g), is as follows: Attorney Robert J. Engelman, "Principal Attorney"—22.4 hours @ $200 per hour = $4480; Attorney Sandra G. Gottlin, "Associate Attorney"—32 hours @ $90 per hour = $2880; plus disbursements (photocopy and fax fees) of $16.13, for a total of $7376.13.

Initially, the court notes that § 52-251 provides that in a proceeding such as this "there shall be allowed to each of the parties to the proceeding such reasonable sum for expenses and counsel fees as the court, in its discretion, deems equitable." In speaking to this, our Supreme Court has said: "A fee that is reasonable or proper must necessarily be one which is fair and equitable." *Hoenig* v. *Lubetkin,* supra, 525. That court has also held that, despite the mandatory form of that language, "even in cases where the statute is applicable that equitable principles control." *Connecticut Bank & Trust Co.* v. *Coffin,* 212 Conn. 678, 696–97, 563 A.2d 1323 (1989). Moreover, the plain language of this statute declares that "each of the parties to the proceeding" is to be awarded "such reasonable sum . . . as the court, in its discretion, deems equitable." It is not, therefore, necessary, for a party to "prevail" in the proceeding in order to come within § 52-251 and no claim to that effect has been made. See *Connecticut Bank & Trust Co.* v. *Coffin,* supra. Our cases have spoken of the "undisputed requirement that the reasonableness of attorney's fees and costs must be proven by an appropriate evidentiary showing." (Internal quotation marks omitted.) *Barco Auto Leasing Corporation* v. *House,* 202 Conn. 106, 121, 520 A.2d 162 (1987), and cases cited therein. The same should apply to

"expenses" under § 52-251. See generally *Bennett* v. *Department of Navy,* 699 F.2d 1140, 1143 (D.C. Cir. 1983); *Copper Liquor, Inc.* v. *Adolph Coors Co.,* 684 F.2d 1087, 1098 (5th Cir. 1982).

Additionally, other principles may be pointed out. It has been well said that "[n]o one can state the reasonable value of legal services as a fact. He can only express his opinion. The value is based upon many considerations." *Hoenig* v. *Lubetkin,* supra, 524; *Piantedosi* v. *Floridia,* 186 Conn. 275, 279, 440 A.2d 977 (1982). The ultimate decision is for the court. Even where expert opinion is offered, and none has been, that is not binding on the court. *Appliances, Inc.* v. *Yost,* supra, 680–81; *Taft* v. *Valley Oil Co., Inc.,* 126 Conn. 154, 161, 9 A.2d 822 (1939). In exercising its discretion in making the equitable determination as to fees to be allowed, the court must determine whether the applicant has discharged the burden of proving entitlement to the fees claimed. *Hensley* v. *Eckerhart,* 461 U.S. 424, 437, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983). In any event, an applicant for attorney's fees is only entitled to an award for time reasonably expended and the amount of time actually expended does not necessarily equal the time reasonably expended. *Blum* v. *Stenson,* 465 U.S. 886, 897, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984); *Hensley* v. *Eckerhart,* supra, 433–34; *National Assn. of Concerned Veterans* v. *Secretary of Defense,* 675 F.2d 1319, 1326 (D.C. Cir. 1982); *Riddell* v. *National Democratic Party,* 545 F. Sup. 252, 257 (S.D. Miss. 1987).

It should be pointed out that the United States Supreme Court has said that while "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate" is "[t]he most useful starting point for determining the amount of a reasonable fee"; *Hensley* v. *Eckerhart,* supra, 433; it has also said that "[t]he product of reasonable hours times a reason-

able rate does not end the inquiry"; id., 434; because "there may be circumstances in which the basic standard of reasonable rates multiplied by reasonably expended hours results in a fee that is either unreasonably low or unreasonably high." *Blum* v. *Stenson,* supra, 897. "The court has few duties of a more delicate nature than that of fixing counsel fees." *Hoenig* v. *Lubetkin,* supra, 525.

Courts have stressed the need to submit proper time records. In this regard it has been said: "The party seeking fees has a duty to submit detailed and contemporaneous time records to document the hours spent on the case. A simple after-the-fact tally is not sufficient. Copies of the actual time records should be submitted." *Denton* v. *Boilermakers Local 29,* 673 F. Sup. 37, 53 (D. Mass. 1987); see also *Calhoun* v. *Acme Cleveland Corporation,* 801 F.2d 558, 560 (1st Cir. 1986); *Grendel's Den* v. *Larkin,* 749 F.2d 945, 952 (1st Cir. 1984); *Wojtkowski* v. *Cade,* 725 F.2d 127, 130–31 (1st Cir. 1984).

The familiarity of the court asked to rule on counsel fees with the particular case is significant, as it can assess the nature of the entire litigation, the manner in which the legal and factual issues were presented at trial, the written submissions filed by counsel and other elements of the litigation with which it is familiar. See *Ruiz* v. *Estelle,* 553 F. Sup. 567, 584 (S.D. Tex. 1982).

A court is not required to accept an attorney's valuation of his own time. See, e.g., *Chrapliwy* v. *Uniroyal, Inc.,* 670 F.2d 760, 767 (8th Cir. 1982), cert. denied, 461 U.S. 956, 103 S. Ct. 2428, 77 L. Ed. 2d 1315 (1983); *Denton* v. *Boilermakers Local 29,* supra, 53. The party seeking fees may introduce evidence of the prevailing market rates in the community. Id., 52; see *Blum* v. *Stenson,* supra, 895 n.11; *King* v. *Greenblatt,* 560 F.2d 1024, 1027 (1st Cir. 1977), cert. denied, 438 U.S. 916,

98 S. Ct. 3146, 57 L. Ed. 2d 1161 (1978). The circumstances that a party may not oppose a fee requested does not divest the court of the power to determine what a reasonable fee is and to allow only that amount. See *Wojtkowski* v. *Cade,* supra, 130; *Miles* v. *Sampson,* 675 F.2d 5, 9 (1st Cir. 1982). Stated another way: "Even where there has been no objection to the size of the attorney's fee requested, it is the responsibility of the court to see to it that the size of the award is reasonable." *Jones* v. *Amalgamated Warbasse Houses, Inc.,* 97 F.R.D. 355, 361–62 (E.D.N.Y. 1983); 6 J. Moore, W. Taggart & J. Wicker, Federal Practice (2d Ed. 1993) ¶ 54.79.

At this point, certain observations applicable to this particular will construction proceeding may be made. It presented serious questions of construction upon which there were genuinely differing claims that were competently and zealously advocated both in writing and orally. It does not involve, however, complex or novel issues but is fairly straightforward. This construction case was not one of long standing, having come to the Superior Court little over one year ago.[11] The pleadings were not complicated. There was no discovery taken so far as appears from the court file. The trial in court on the construction issues, presented upon a stipulation of facts, actually took about one and one-half hours. From remarks made at that trial it was indicated that the issue "ultimately involved about One Million Dollars. . . ."[12] Other than statements from counsel

[11] The return date to the Superior Court of this matter was August 27, 1991, and it was in fact filed in this court on August 16, 1991, before the return day. This action was, therefore, "pending" in this court after it was filed although that was before the return day. *Algonquin Gas Transmission Co.* v. *Becker,* 25 Conn. Sup. 448, 206 A.2d 846 (1952); see *Demar* v. *Open Space & Conservation Commission,* 211 Conn. 416, 430, 559 A.2d 1103 (1989).

[12] Counsel for the trustee said in part: "The issue today involves about One Million Dollars or ultimately will involve above One Million Dollars in value, either passing to Mr. Brewster or passing to the decedents of the sisters-in-law or possibly charity. . . ."

themselves as to what their usual hourly rates were or what the community rate was, there was no evidence adduced in that regard before this court. No expert testified. It bears noting that the requests in this proceeding are not in the context of public interest litigation where the statute involved legislatively enacts a private attorney general concept. Rather, the court is involved with what might be called private interest litigation that concerns the settling of the differences between the contenders.

First the court will take up the Greene request made under § 52-251. Attorney Miller (and Attorney James Gentile who has not filed a separate request for attorney's fees) represented numerous defendants (some twenty-six) who, generally speaking, were those who take through Constance Greene, the most recently deceased sister-in-law, the two remaining sisters-in-law and those who ultimately take through them. Miller was, for practical purposes, "lead counsel" in advocating the construction advanced by all the defendants except Brewster. Counsel for the charities also seeking fees under § 52-251, while filing a short brief, in doing so, expressly indicated that they adopted Miller's position and also said so at the trial. The guardian ad litem, in developing his argument both in his briefing and at the trial agreed with the Miller position.

### A

The Greene request is stated as follows: Fees—$23,972; Costs—$363.24, for a total of $24,335.24.

The court has examined in detail both the Greene motions for counsel fees in which the first date for rendering services given is September 23, 1991. It has determined that the following hourly rates are reasonable for the attorneys in the proceeding: William J. Britt—$185; Barbara S. Miller—$160; Anne Ragusa—$20.

In examining the itemized number of hours of each of the above three attorneys, the court concludes, under all the circumstances, that the number of hours to be allowed as reasonably expended by each are as follows: William J. Britt—24.3 hours; Barbara S. Miller—73 hours; Anne Ragusa—289.5 hours.

Thus, reasonable counsel fees ordered awarded as to the Greene request are found to be: William J. Britt—24.3 hours @ $185 per hour = $4495.50; Barbara S. Miller—73 hours @ $160 per hour = $11,680; Anne Ragusa—289.5 hours @ $20 per hour = $5790; for a total of $21,965.

Expenses are allowed and awarded in the amount of $363.24.

B

Next, this count examines the charities' request submitted by Wiggin and Dana concerning their representation of the Children's Center and the American Society for Prevention of Cruelty to Animals, two of the charities that are contingent beneficiaries of the trust created under article thirteenth of the will involved. This request, which has been examined in detail, asks "for an allowance of $2205.28 in attorney's fees and expenses." The first date given for services rendered on the time sheets attached is August 15, 1991.

The court has determined that the following hourly rates are reasonable for the attorneys in this proceeding: David P. Faulkner—$185; Phyllis M. Pari—$95.

After examining the itemized number of hours of the attorneys indicated, the court concludes that, under all of the circumstances, the number of hours to be allowed as reasonably expended by each is as follows: David P. Faulkner—11.94 hours; Phyllis M. Pari—7.85 hours.

It appears to the court, after examining the itemized hours set out in this request, that at the hourly rate this court deems reasonable in this proceeding, this request for allowance indicates "billing judgment" by way of adjusting counsel fees for the two charities involved given the time expended. See generally *Hensley* v. *Eckerhart,* supra, 434.

The request of the charities for an allowance of $2205.28, in attorney's fees and expenses is approved.

C

The remaining request made under § 52-251 to be examined is the one by Brewster, which claims counsel fees and expenses in the total amount of $24,140.53.

The court notes at the outset several matters. This request does not emanate from a prevailing party. The statute, i.e. § 52-251, however, by its plain language applies to "each of the parties to the proceeding." Moreover, our Supreme Court has so indicated. *Connecticut Bank & Trust Co.* v. *Coffin,* supra, 696.

There is, nevertheless, another matter that is threshold to at least a portion of this application, which must be decided at this point. The itemized time sheets as to services rendered begin with the entry of April 24, 1991, and are followed by a number of entries up to August 5, 1991, the date upon which the writ, summons and complaint in this action were served upon Brewster. Section 52-251 provides in part that: *"In any action* . . . for the construction of a will or for the advice of the court as to the administration of an estate or trust . . . there shall be allowed *to each of the parties to the proceeding* such reasonable sum for expenses and counsel fees as the court, in its discretion, deems equitable." (Emphasis added.) There was

no "action" in the present case insofar as § 52-251 is concerned, until service upon Brewster on August 5, 1991, because, in Connecticut an "action" is commenced on the date of service of the writ upon the defendant. *McGaffin* v. *Roberts,* 193 Conn. 393, 401 n.9, 479 A.2d 176, cert. denied, 470 U.S. 1050, 105 S. Ct. 1747, 84 L. Ed. 2d 813 (1985); *Valley Cable Vision, Inc.* v. *Public Utilities Commission,* 175 Conn. 30, 33–34, 392 A.2d 485 (1978); *Seaboard Burner Corporation* v. *DeLong,* 145 Conn. 300, 303, 141 A.2d 642 (1958). Clearly, Brewster was not a "party" to this action until service upon him on August 5, 1991. For that matter, neither was any other defendant in this proceeding. In construing § 52-251, the objective is to give effect to the intended purpose of the legislature. *State* v. *Delafose,* 185 Conn. 517, 521, 441 A.2d 158 (1981); *Beizer* v. *Goepfert,* 28 Conn. App. 693, 698, 613 A.2d 1336, cert. denied, 224 Conn. 901, 615 A.2d 1044 (1992), cert. denied, U.S. , 113 S. Ct. 1416, 122 L. Ed. 2d 786 (1993). When the statutory language is plain and unambiguous in meaning, no further inquiry is necessary because it is assumed that the language conveys legislative intent. *State* v. *Delafose,* supra. Nothing in this statute shows any legislative intent to have it apply to counsel fees and expenses before an "action" is instituted. The relief by way of counsel fees and expenses afforded those parties to the class of litigation specified in § 52-251, therefore, is available only after an "action" is instituted under that statute. An allowance for counsel fees and expenses incurred prior to any such "action" is not authorized by this statute and the court is without power in that regard. The court, accordingly, can make no allowance for any fees or expenses incurred prior to August 5, 1991.

Before determining what action remains to be taken on the Brewster requests, one other matter deserves brief comment. There is some suggestion that equity

should preclude Brewster from an award under § 52-251 because to do so would tend to deplete the assets of the trust which currently benefits the trust beneficiaries, especially since he has already received one half of the residuary estate of the testatrix. Brewster's reply points out that he is a party to this action because he, along with the other defendants, have been brought into it by the trustee who instituted the court action. He argues that the action arises because of the concern of the trustee as to "whether to distribute the principal of the trust according to the decedent's clear instructions, or to distribute it according to the interpretation of the trust beneficiaries." He argues that eligibility for an award under § 52-251 does not depend on who prevails. As to any depletion of assets going to the present trust beneficiaries in the event that he prevailed and established, in effect, a partial intestacy, Brewster contends in that event that any award made to counsel opposing his position would reduce the amounts he would receive. This court is aware that Brewster filed the objection to the 1991 accounting in the Probate Court and that, thereafter, this action was commenced. This court has already pointed out that there existed a genuine difference of opinion between Brewster and the other defendants as to the claimed construction, and under all the circumstances, the court believes that Brewster falls within § 52-251 and that equitable considerations do not bar an award to him even though he did not obtain the result he sought.

The court has examined in detail the itemized Brewster request beginning with the date this action was instituted, i.e. August 5, 1991. It has determined that the following hourly rates are reasonable for the attorneys in this proceeding: William H. Clendenen—$185; Nancy Walker—$125; James E. Clifford—$100.

After examining the itemized number of hours of the above attorneys, the court concludes that under all the circumstances the number of hours to be allowed as reasonably expended from August 5, 1991, by each are: William H. Clendenen—31.30 hours @ $185 per hour = $5790.15; Nancy Walker—50.9 hours @ $125 per hour = $6362.50; James E. Clifford—4 hours @ $100 per hour = $400 for a total of $12,522.65.

Charges for legal assistants starting from August 5, 1991, are allowed in the sum of $64 and expenses from that date are allowed in the sum of $54.03. This makes for allowances for counsel fees and expenses granted under the Brewster request in the total amount of $12,670.68.

### D

Finally, the application of Attorney Robert Engelman, who was appointed by this court as guardian ad litem, will be considered. As guardian ad litem, his application comes under General Statutes § 45a-132 (g), unlike the prior requests, which were made under § 52-251. The itemization of time expended, which begins with the entry of November 5, 1991, is in support of the following application for compensation: "Robert J. Engelman, principal attorney, 22.40 hours at $200 per hour = $4480; Sandra G. Gottlin, associate attorney, 32 hours at $90 per hour = $2880, for a total of $7360." The request also seeks an allowance in the amount of $16.13 for incurred necessary disbursements.

As pointed out, the court here is not dealing with the same statute as it was with the other applications for fees and expenses. Under § 45a-132, the guardian ad litem is an officer of the court for the specific action for which he is appointed. See *Ottaviano* v. *Garlick,* 21 Conn. Sup. 181, 150 A.2d 611 (1958); see also *Altieri* v. *Altieri,* 21 Conn. 376, 155 A.2d 758 (1959); 43 C.J.S., Infants § 222, p. 571. One court has said that "[a]

guardian ad litem is someone appointed by the court in which a particular litigation is pending to represent . . . an unborn person in that particular litigation." *Bowen* v. *Sonnenburg,* 411 N.E.2d 390, 396 (Ind. App. 1980); see General Statutes § 45a-132 (a).

The guardian ad litem entered this litigation later than counsel for the other defendants. Concededly, the issues were more sharply defined when he did so. Again, the court has examined in detail the time records submitted. It is not necessary for the court to go into any detail here concerning what Engelman, as the court appointed guardian ad litem, claims. It is deemed proper to say, however, that the court has determined that a reasonable hourly rate for him in this litigation is concluded to be $175 per hour and that he has performed his duties quite diligently and carefully.

The statute states "reasonable compensation" is the benchmark. The court appreciates that included in his application is a claim that constitutes a substantial portion of the ultimate amount claimed for services of an "associate attorney" whose services were retained. Under the circumstances, it is concluded that the "Application for Guardian ad Litem Fees" requesting an allowance of $7360 is ordered that "reasonable compensation" be allowed in the amount of $5360. The disbursements of the guardian in the amount of $16.13 are ordered allowed.

The counsel fees and expenses hereinabove allowed under § 52-251 as well as the compensation and disbursements of the guardian ad litem allowed under § 45a-132 (g) are ordered to be paid by the trustee of the trust created under article thirteenth paragraph (B) out of the principal or corpus of that trust.

Judgment in this action is hereby ordered to be entered in accordance with the foregoing.