[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION FOR DEFICIENCY JUDGMENT
A judgment of strict foreclosure was entered on July 17, 1993 by the court (Teller, J.) in favor of the plaintiff, Herbert R. Kuhn, against the defendants, Saul A. Sadinsky, Michael A. Rakosky, Nancy J. Dubicki and Thames Mews Associates, a Connecticut general partnership of which Sadinsky, Rakosky and Dubicki are general partners. The first mortgage so foreclosed was dated August 1, 1986, was in the original amount of $200,000.00 and covered real property at 188-190 Thames Street in Groton on which two rental properties were situated. The defendants are jointly and severally liable on this obligation.
On July 19, 1993, all the parties stipulated for the entry of judgment of strict foreclosure. They also stipulated that "the value of the property will be entered at Ninety Thousand ($90,000.00) Dollars for purposes of this judgment without prejudice and with reservation of rights for all parties to argue the valuation", that a law day be set for August 11, 1993, and that "the parties reserve the right to argue attorney's fees at a future hearing." The plaintiff filed an affidavit of debt which sets out inter alia that the debt totaled $229,915.52 with that sum broken down into the "Unpaid Principal balance" of $189,756.60 and "Interest from August 1, 1991 to July 19, 1993 ($55.89 per diem)" of $40,159.52. The plaintiff's appraiser filed an affidavit, dated July 19, 1993, that the appraised value of the premises, as of May 6, 1993, was $90,000.00.
The judgment file of July 19, 1993 in the court file is somewhat unusual. It indicates no breakdown of value between the land and the buildings but under total of these, inserts "$90,000.00" as well as stating as to that "Court notes appraisal value, but makes no finding of value." As to the "debt", that file states "$189,756.00 unpaid principal balance (plus interest claimed of $40,159.52)", as well as noting that "Defendant has a right to contest the interest claimed as part of the debt at any deficiency hearing." While the court set the law day as August 11, 1993, as to "Counsel Fees", it noted "$ not ordered" as to attorney's fees. CT Page 2754
Thereafter, on August 19, 1993, the plaintiff filed his motion for deficiency judgment which recites, inter alia, that on the July 19, 1993 judgment date ". . . the subject project was appraised at $90,000.00, and "the plaintiff's debt was found to be $189,756.00 principal and claimed interest in the amount of $40,159.52." It also alleges that because the defendants did not redeem on their law day that title became absolute in the plaintiff on August 11, 1993. Because of the valuation recited and the amount of the debt, the plaintiff believes a deficiency existed and, therefore, he seeks an evidentiary hearing to set a value and that a deficiency judgment be entered in accord with such value." The plaintiff's motion for a deficiency judgment has been timely filed. General Statutes 49-14(a). This motion was referred to the undersigned who held an evidentiary hearing on it which lasted for two court days.
To put the plaintiff's dollar position on this motion in context, we set that claim out briefly here and will examine it shortly in detail. The plaintiff claims that as the result of deficiency judgment hearing he has proved by "unrefuted evidence the following debt":
 1. Judgment debt as of date of original judgment of strict foreclosure:
Unpaid Principal balance $ 189,756.00
 Interest from August 1, 1991-July 19, 1993 ($55.89 per diem) 40,159.52 ------------ TOTAL $ 229,915.52
 2. Interest from date of judgment to date of title vesting in plaintiff ($55.89 per diem x 23 days) 1,285.47
 3. Interest from date of title vesting to date of deficiency ($41.21 per diem x 110 days) 4,533.10
4. Costs on original judgment 19,431.50
 5. Municipal Real Estate Taxes through 8/11/93: 1989 List $ 5,302.44 1990 List 4,679.28 1991 List 4,056.12 1992 List (1st payment) 2,003.73 16,041.57 ---------- ---------- TOTAL $ 271,207.16
CT Page 2755
Further, he claims that the evidence has established that the "total market value of the premises as of August 11, 1993" was $64,000.00 (the value opined by his appraiser, Christopher Miner). Thus, he maintains deducting the $64,000.00 valuation from the total debt of $271,207.16 yields the sum of $207,207.16, to which amount he claims he is entitled as a deficiency judgment.
This motion for deficiency judgment has generated a number of claims by all the parties which we examine below. At this point it will be helpful to set out their claims prior to getting into the facts found.
We turn first to the plaintiff's claims. He maintains that the total market value of the subject premises as of August 11, 1993 has been established at $64,000.00 leaving a total deficiency of $207,207.16. As to the $64,000.00 valuation put on the premises by his expert appraiser Miner, the plaintiff contends that that value is properly arrived at by deducting from Miner's "consistent valuation of $110,000 to $112,000 rendered prior to consideration of repair cost" the $48,000.00 cost of repairs claimed necessary to the premises as testified to by his "construction expert" Thomas Morgan. The plaintiff attacks the credibility of the defendants' appraisal expert, Jerome Silverstein, not only as to Silverstein's ultimate opinion of value as of August 11, 1993 in the amount of $200,000.00, but also the underpinnings of that opinion at which Silverstein arrived by employing the income capitalization and comparable sales approaches. These were also the same two approaches to valuation used by Miner. He claims that the defendants did not repair and maintain the premises consistent with their obligation to do so, that their conduct was responsible for their present situation and that they were unable to sell it or obtain financing for it even when they tried to do so.[1]
Continuing, the plaintiff argues that the defendants have not, even if they can raise any, sustained their burden of proof as to any equitable defense to the present motion for deficiency. Here he specifically refers to the defenses of (1) a tender of a CT Page 2756 deed-in-lieu of foreclosure and relief based on that, and (2) "laches" on the plaintiff's part in pursuing remedies under the contract created by the mortgage note and deed. As to these two he maintains that under either the defendants must show, and he says they have not, that they have dealt with him in good faith and in accord with their duties under the mortgage deed and note. The plaintiff disclaims any bad faith, inequitable or unreasonable conduct on his part. In any event, the plaintiff argues that this court should not consider either such defense as neither was specially pleaded. Finally, as already noted, he contends that he is entitled to a deficiency judgment in the amount of $207,207.16.
The defendants, on the other hand, raise three issues which they develop. The first is what was the value of the property on the law day of August 11, 1993. Here they argue the acceptance of the opinion that its value was $200,000.00 as their expert witness Silverstein testified. In doing so they urge the rejection of the opinion of value of $64,000.00 placed upon it by Miner, the plaintiff's expert, who maintained that at least $48,000.00 in repairs were needed in accordance with Morgan's opinion. In advocating Silverstein's opinion and attacking the plaintiff's expert testimony they refer to the testimony of each including what is "market value", the present real estate climate and the like. The defendants next maintain that the plaintiff acted improperly and/or delayed the resolution of this matter so as not to be allowed to obtain relief to which he is not equitably entitled. Briefly, on this branch of the matter, the defendants claim that this action could have been resolved shortly after their default in August 1991 when the defendant Rakowsky offered to deed the property to the plaintiff in satisfaction of the then-existing debt. However, although several communications took place to that end, including a December 10, 1991 letter from the defendant Dubicki to the plaintiff's attorney offering to convey the property "in exchange for a liquidating of the debt" together with a written appraisal by Silverstein that the property had a value of $200,000.00, nothing occurred until April 1992 when plaintiff's counsel is said to have demanded full payment of the debt thus rejecting the offer to deed the property for the debt as proposed by the plaintiffs. Thereafter, the plaintiff began this foreclosure action which was returned to court on June 16, 1992. The defendants, in addition, pointing to the progress of the pleadings and the failure of the plaintiff for almost two years to prosecute expeditiously constituted an unreasonable delay in CT Page 2757 fact prejudicing the defendants by such things as the continuing accrual of interest on the debt and property taxes. They contend that the plaintiff has delayed the conclusion of this foreclosure action "in spite of the lack of contest by the Defendants." Pointing out that the plaintiff is now seeking interest not only to the date of vesting of title on August 11, 1993 and thereafter to the date of the deficiency hearing on November 29, 1993, as well as costs and taxes, the defendants argue that these should be denied. They claim that the plaintiff's delay "was intentional, without justification and therefore, the Plaintiff should be denied his claim for interest, taxes and costs which accrued subsequent to August 1, 1991."
The third issue raised by the defendants is what should constitute the debt this court should find under the circumstances of this case. Arguing that parties to a contract have a duty to act in good faith and fair dealing concerning its performance and enforcement and that the plaintiff has acted improperly or delayed here to their prejudice, they ask this court in exercising its equitable powers to limit the amount of interest and other charges to which the plaintiff might otherwise be entitled. They argue that the undisputed amount of the debt as of August 1, 1991 was $189,576.00 and that the outstanding taxes on the property as of that date were $4,315.77 for a total debt of $194,071.77. Because Silverstein's appraisal "establishes that the value of the property at that time was $200,000.00" (thus less than the debt), the defendants submit that no deficiency should be found by this court.
In this matter credibility was quite important. This is so not only as to the plaintiff and those defendants who testified but also as to the experts Miner, Silverstein and Morgan. In that context certain guidelines are now noted. Uncontradicted testimony does not because it is uncontradicted become admitted or undisputed nor does the strength of a witness's belief raise it to that level. Stanton v. Grigley, 177 Conn. 558, 563 (1979). The fact finder has "the unique opportunity to view the evidence in a totality of circumstances including its observations of the demeanor and conduct of the witnesses and the parties . . . ." Sportsman's Boating Corporation v. Hensky, 192 Conn. 747, 750
(1984) quoting from Kaplan v. Kaplan, 186 Conn. 387, 391 (1982); Solomon v. Hall-Brooke Foundation, Inc., 30 Conn. App. 136, 141
(1973). It may also consider the interest of any witness in determining credibility. Buonano v. Cameron, 131 Conn. 513, 515
(1945). Our Supreme Court has said that "It is the peculiar CT Page 2758 province of the trial court to observe the demeanor of the parties and their witnesses and to draw inferences therefrom as to the motives underlying their testimony and conduct. Findings based upon these observations in the courtroom are in the same category as findings based upon a view of premises or property. Such evidence is as properly to be considered by the court in rendering its decision or making its finding as if presented by the lips of witnesses." Dadio v. Dadio, 123 Conn. 88, 93 (1937); Auger v. Auger, 133 Conn. 211, 213-214 (1946). The trier may accept or reject the testimony of a witness, offered by one party or the other, expert or otherwise, in whole or in part. DiDiego v. Zarro, 19 Conn. App. 291, 294, 295 (1989); Crest Plumbing 
Heating Co. v. DiLoreto, 12 Conn. App. 468, 476 (1987); Barrilla v. Blake, 190 Conn. 631, 639 (1983). Moreover, the trier is not bound by the uncontradicted testimony of any witness including experts. Mather v. Griffin Hospital, 207 Conn. 125, 145 (1988); Bieluch v. Bieluch, 199 Conn. 550, 555 (1986). The trier of fact determines the credibility of all witnesses and the weight to be accorded their testimony and, where the evidence conflicting, its probative force is for the trier to decide. Eichman v. J. J. Building Co., 216 Conn. 443, 451-452 (1990); Robert Lawrence Associates, Inc. v. DelVecchio, 178 Conn. 1, 145 (1979); Steinman v. Maier, 179 Conn. 574, 576 (1978).
In the light of General Statutes 49-1 (foreclosure a bar to any further action on the mortgage debt, note or obligation), the deficiency judgment procedure provided for under General Statutes49-14(a) is "therefore, the only available means of satisfying a mortgage debt where the security is inadequate to make the foreclosing plaintiff whole." First Bank v. Simpson, 199 Conn. 368,371 (1986); Eichman v. J. J. Building Co., 216 Conn. 443,449 (1990). It is "the value of the premises on the date that title becomes vested in the mortgagee that determines whether the mortgagee is entitled to a deficiency judgment. DiDiego v. Zarro, 19 Conn. App. 291, 294 (1989) . . . . ." Eichman v. J. 
J. Building Co., supra. Section 49-14(a) is "solely a provision for appraisal and deficiency proceeding following foreclosure." Society for Savings v. Chestnut Estates Inc., 176 Conn. 563, 568
(1979); DiDiego v. Zarro, 19 Conn. App. 291, 294 (1989). Our appellate courts have had occasion in discussing credibility to address it specifically in the context of this deficiency judgment statute in 49-14. See, e.g. Eichman v. J. J. Building Co., supra; New Haven Savings Bank v. West Haven Sound Development Co., 190 Conn. 60, 69-70 (1983); DiDiego v. Zarro, supra. The burden of proving a deficiency is upon the plaintiff. CT Page 2759 Eichman v. J. J. Building Co., supra 451. That is that the plaintiff has the burden of proving that the property was worth less than the amount of that debt on the date of the vesting of title in the plaintiff. Our Supreme Court has said:
 "`"[T]he plain object [of the deficiency judgment statute] is to require a mortgage creditor, who appropriates the property in part payment only of his debt, to apply the actual value of the security to the debt before collecting any claimed deficiency" . . . .' People's Holding Co. v. Bray, 118 Conn. 568, 571, 173 A. 233 (1934), quoting Staples v. Hendrick, 89 Conn. 100, 103, 93 A. 5 (1915); Maresca v. DeMatteo, 6 Conn. App. 691, 694, 506 A.2d 1096 (1986). Implicit in the purpose of the statute is the initial prerequisite that the plaintiff provide the court with sufficient evidence to demonstrate that she is entitled to a deficiency judgment. Indeed, this court has held, in a deficiency judgment proceeding, that `the trier may not decide an issue which is wholly unsupported by the evidence.' New Haven Savings Bank v. West Haven Sound Development, 190 Conn. 60, 71-72, 459 A.2d 999 (1983)."
Eichman v. J J. Building Co., supra, 450.
 I.
Turning to the property which is the subject of this foreclosure proceeding, it consists of two buildings on Thames Street in Groton on a lot about .36 of an acre in size. The larger building is located at the front of the lot and is a two-story frame structure and is divided into four rental units made up of three one-bedroom apartments and one two-bedroom apartment. The smaller building which is in the rear contains two efficiency apartments and one two-bedroom apartment. The larger building which was sometimes referred to as the farm house was built in about 1793. The smaller building which was sometimes referred to as the carriage house was built in about 1855 and is a converted carriage house. The condition of each of the buildings, their state of repair or non-repair and the like depends upon what evidence is credited and there is serious conflict. CT Page 2760
The defendants purchased this property from the plaintiff for $257,500.00 by deed recorded on August 1, 1986 on which date the mortgage involved in this case was executed. There was and is not presently any other mortgages on the subject property.
 II.
Continuing, we first address the issue of the value of the subject property as of August 11, 1993, the date upon which title became absolute in the plaintiff. Here we note briefly the opinions of the real estate experts as to value on that date. Miner's opinion was that the property had a value of $64,000.00. He arrived at this conclusion by factoring into what is said to be his earlier consistent valuation of $110,000.00 to $112,000.00 the opinion of the plaintiff's expert Morgan of Morgan's opinion of repairs in the amount of $48,350.00 to make the subject property "marginally rentable." Doing so yields the opinion of $64,000.00. Silverstein's opinion was that the subject had a value of $200,000.00 and, in doing so, he said he considered the overall condition of the two buildings on the property. In arriving at their respective opinions of value, both Miner and Silverstein decided that the cost approach to value was not appropriate and both did employ the income capitalization and sales comparison approaches. Both placed more weight on the income capitalization approach to value.
In considering the plaintiff's claim on value the evidence given by his expert Morgan must be considered as Minor [Miner] concededly considered it and, in effect, put it in his ultimate opinion of $64,000.00. Moreover, any opinion of value by Miner even before that would seem to have a Morgan element in it as Morgan conducted his first examination of the site on January 31, 1992 and Minor was there also on that date. Morgan said it was dark when he was there on January 31, 1992 and so he went back on February 1, 1992, the following day. Morgan also went there on March 4, 1993 as well as on November 23, 1993. The only written report of Morgan in evidence was that of January 31, 1992, and that was directed to Miner and it contained no dollar amounts although it set out certain problems with the property.
Miner submitted a lengthy written appraisal to the plaintiff in April 1992 in which he opined that "market value interest of the fee simple interest" was $110,000.00. It is interesting to note that in this 1992 appraisal Miner's computation of arriving at value under the income capitalization approach includes $2,200.00 CT Page 2761 as a debit in computing value under the legend of "Less Cost of Needed Improvements" at a time after Morgan had inspected the premises twice and at a time before this foreclosure action was even commenced.
When, however, we get to Miner's May 1993 appraisal in which, using the income capitalization approach, Miner's opinion of market value of the property "as is, as of March 4, 1993" is $90,000.00. In arriving at that figure Miner deducted $20,000.00 after having capitalized the net operating income by .1102 (his capitalization rate) and the $20,000.00 deduction was entitled "Less Cost to Correct." This $20,000.00 was the figure Morgan said he gave orally to Miner. Morgan at that time had been to the site once since his 1992 inspections and that was on March 4, 1993. Morgan testified at this trial on November 28, 1993 and he had again been at the subject site on November 23, 1993. At the trial Morgan testified that his opinion was that the needed repairs were in the amount of $48,000.00. Miner said that he deferred to Morgan's expertise and accepted his $48,000.00 figure in making his final opinion of value of $64,000.00.
At the trial plaintiff's counsel maintained Miner's position on value had been consistent throughout and he employed the courtroom blackboard to demonstrate his claim. That argument went thusly:
 Miner's 1992 opinion $ 110,000.00 "Less Cost of Improvements" 2,200.00 ------------ $ 112,200.00
 Miner's 1992 opinion $ 110,000.00 "Less Cost to Correct" 20,000.00 ------------ $ 90,000.00
 Miner's 1992 opinion including "Less Cost to Correct" item $ 112,000.00
 Minus Morgan's November 28, 1993 opinion of repairs $ 48,000.00 ------------ $ 64,000.00 CT Page 2762
In examining the August 11, 1993 opinion of $64,000.00 made by the plaintiff certain observations are made. The plaintiff's brief, in arguing for the acceptance of Morgan's repair testimonial opinion, states that it "was reasonably relied on by Miner and not contested by Silverstein." The court does not agree. Silverstein, as he testified, acknowledged that the property needed some work but not to the degree Morgan had said. He believed that it needed minor work but not major work. He also did not regard as major some items of repair that Morgan did. Besides having performed about 3000 to 4000 appraisals over his career, Silverstein had built 89 buildings early in his career. Although Silverstein did not give a specific figure for what he felt needed repairs would come to, he considered, in using the income capitalization approach for his value opinion maintenance figures for this property as well as the overall condition of the two buildings. Some of Morgan's figures were unpersuasive and lacked any detail. Morgan's repair estimate[2]
for the farm house repairs was $39,000.00 just to make it just marginal enough to rent the units in it with the balance of his estimate going to make the carriage house rentable. Silverstein, on the other hand, maintained that all the units in both buildings were rentable although minor work was necessary. As stated, he did not do an evaluation, as Morgan did, to arrive at a dollar amount to make the rental units "marginally rentable." While we recognize that while the fact that an expert opinion, such as Morgan's or Miner's or Silverstein's may include materials drawn from other sources, inadmissible in and of themselves, that does not render the opinion inadmissible but rather goes to its weight. See, e.g. Common Condominium Assns. Inc. v. Common Associates, 192 Conn. 150, 152 (1984); Whitworth v. State Highway Commissioner, 161 S.E.2d 698, 701 n. 2 (1968). Whether such estimates are fair as well as reasonable, especially when they are plugged into another's opinion of value as here should be considered. Not only does this court disagree with the claim in the plaintiff's brief that Silverstein was "not contested by Silverstein" but also does disagree with his claim that suggests that Morgan's testimony was "virtually without dispute." Even where all or part of an expert's testimony is uncontradicted that does not require its acceptance by the trier in passing inter alia on credibility. This court cannot credit Morgan's opinion of $48,000.00 for repairs which figure played into Miner's opinion of value of $64,000.00. This alone means we do not accept the $64,000.00 opinion of value as to August 11, 1993 in Miner's income approach. CT Page 2763
In addition, Miner used a 22% vacancy rate in arriving at his effective gross income figure in the income approach leading to his $64,000.00 opinion, while Silverstein used a 7% rate in his income approach, leading to his $200,000.00 opinion. Parenthetically, both Miner and Silverstein on this approach are not very far apart on their estimates of potential gross income from this property with Miner estimating $37,800.00 and Silverstein estimating $39,300.00. The vacancy rate is quite another matter as there exists a great disparity. An examination of the methodology used to arrive at a value opinion in the income capitalization approach illustrates, as did the credible evidence, that the vacancy rate is "definitely" important in that analysis. As Silverstein noted the climate for income from rental properties such as the subject property was improving. While both he and Miner characterized the local and area economic picture, Silverstein's was the more credible. The vacancy rate testimony of Silverstein was the more acceptable although we are not persuaded that 7% is the precise figure to accept. Moreover, Miner and Silverstein are not at all in accord concerning that element of the income capitalization rate that involves the percentage of effective gross income attributable to the management aspect of effective gross income. Here Miner allots "about 8%" while Silverstein attributes "5%" to that aspect.
On the credible evidence we cannot accept the ultimate $64,000.00 opinion of value urged upon the court by the plaintiff in its income capitalization analysis.
After analyzing the income capitalization approach of both parties, determining the credibility of the evidence and keeping in mind that foreclosure, including its deficiency judgment flavor, we conclude that the value of the subject property as of August 11, 1993, the date on which title vested in the plaintiff, is equitably, in terms of dollars, between the opinions of Miner and Silverstein. This is arrived at not only by a consideration of the evidence adduced on the income capitalization approach of the experts Miner and Silverstein, but also upon an evaluation of their analysis under the comparison sales approach which both also used to support their respective opinions given in their income capitalization analysis.
Miner and Silverstein also employed a comparison sales analysis. In this approach Miner utilized five sales to opine that the market value of the subject property "as-if repaired and at stabilized occupancy" to indicate value "As is, Rounded" to be CT Page 2764 $100,000.00. In his analysis then the cost of completing the repairs is then deducted in order to arrive at an indication of the as-is value. On the other hand, Silverstein used two sales to arrive at his opinion of $199,500.00. Of Miner's five comparables four were in Norwich and one in New Haven, whereas Silverstein's two comparables were in New London. Miner's New London comparable was the same as one of Silverstein's. In his sales comparison analysis Miner arrived at a figure of $17,750.00 as the value for each of the seven units of the subject, whereas Silverstein's figure there was $28,500.00 for each of the seven units. The two, despite their use of the sales comparison, differed on whether there were truly comparable sales to utilize. Silverstein maintained there really were none in 1992 and 1993 and we note neither of these experts used as a comparable a sale in 1992 and 1993. Three of the five comparables used by Miner were transactions in which banking institutions were the grantors while this was not so with either of Silverstein's comparables. There was here conflicting evidence as to whether sales by a bank in the current financial climate could reasonably be found to be "arms length" transfers and thus furnish a reliable indicator of a property's ability to generate fair investor income. The credible evidence here, including that of "Market Value Defined", is that banking institutions in these times have a lot of real property "some like this" and that they are inclined to afford more favorable financing. On two of Miner's comparables where banks were the grantors, the bank mortgage loan on one was 85% of that loan and on another was 90% of the loan. On all the credible evidence, including adjustments, the court concludes that as to the sales comparison approach it is persuaded that Silverstein's analysis is the more reliable.
On the credible evidence the court concludes that the market value of the subject property on August 11, 1993, the date on which title became absolute in the plaintiff, was one hundred and forty thousand ($140,000.00) dollars.
 III.
The plaintiff next turns to the defendants' claims of their "alleged equitable defenses" which he reasons will be (1) that of a tender of a deed in lieu of foreclosure and (2) laches. He further contends that not only were either not pleaded but even if they should be considered to have been, the defendants have not sustained their burden of proof as to either. Moreover, such defenses, he contends, must be accompanied by the showing of that CT Page 2765 good faith and fair dealing applicable to their obligations under the mortgage deed and note including the payment of interest and taxes, the performance of ordinary repairs,[3] the prevention of waste and keeping in mind that defendants should not benefit from delays caused by them during this litigation.
The defendants, on the other hand, pointing to the long period of time consumed in bringing this litigation to its present state, argue that the delay on the plaintiff's part was intentional and without justification and, therefore, he should be denied his claim for interest, taxes and costs that accrued after August 1, 1991. They claim that the evidence shows that this entire matter could have resolved shortly after their August 1, 1991 default, that they affirmatively offered them to turn the property back to the plaintiff, that this litigation was not actually instituted until many months later which institution was the manner in which they learned that their offer to deed the property back was turned down. They refer to the progress of the pleadings as furthering their claim that the plaintiff was the one who really caused the delays, not them. This, they maintain, took place despite no real contest by them and to their serious prejudice. They further maintain that they recognize that parties to such an arrangement as this mortgage have a duty to act in good faith and fair dealing. They accordingly maintain that, as of August 1, 1991, the undisputed amount of the debt was $189,756.00 and the outstanding taxes on the property as of that date were $4,315.77, thus making for a total debt of $194,071.77. Because, they continue, Silverstein's first appraisal establishes that the value of the property as of that time was $200,000.00 then "no deficiency should be found by this Court." This court does not agree with the defendants that no deficiency should be found.
Now, we consider the matter of the defendants' claim that they offered a proposal that was in the nature of a deed in lieu of foreclosure. The background of this claim may be briefly stated as follows: The defendants had made all the principal payments as they became due until August 1, 1991 when the defendant Rakosky informed the plaintiff that they could not continue to pay. Rakosky offered at that time to deed the property to the plaintiff in satisfaction of the defendants' obligations under the mortgage deed and note. The plaintiff allegedly informed Rakosky that as a condition of doing so, he would want the interest made current, the back taxes owing be paid and the tenant security deposits paid over to him, and this is not at all CT Page 2766 clear. In any event, Rakosky again suggested to the plaintiff that they would deed the property to the plaintiff and give him the keys in full satisfaction of their obligation under the mortgage deed and note. The plaintiff contacted an attorney and in early September 1991, Attorney Holth contacted Rakosky and directed him not to contact the plaintiff further about this matter. Parenthetically, Attorney Holth is a member of the law firm who represents the plaintiff. Not having heard from Mr. Holth with whom he had spoken on a number of occasions, Dubicki wrote Holth on December 10, 1991. In that letter he said, inter alia, that Rakosky had advised Kuhn and later Holth that the defendants "were willing to deed the property back to Dr. Kuhn in order to liquidate the existing debt" and he (Dubicki) had also advised Holth likewise. Not having heard from Holth, Dubicki wrote in his December 10, 1991 letter that he was "again communicating our prior offer in writing." That letter also indicated that the outstanding principal debt as of August 1, 1991, was $189,756.00 and, since that date, interest had accrued on that debt at the rate of $55.89 per day. In addition, Dubicki stated that the taxes on the list of 1989 were outstanding in the total amount of $4,315.77 and that the first half of the 1990 list in the amount of $2,212.35 remained unpaid. That letter also indicated that there was enclosed an appraisal performed by F. Jerome Silverstein setting the value of the subject property at $200,000.00. While this $200,000.00 appraisal was not in evidence, Dubicki testified credibly that he hand-delivered to Holth not only a copy of that appraisal but also his letter of December 10, 1991. Some time much later the defendants were informed by the plaintiff that their offer to deed the subject property in satisfaction of the mortgage was rejected. As indicated, the instant foreclosure was instituted in June 1992.
It has been stated generally that "the purpose and object of tender is to enable the other party to accept the money and close the transaction and thus relieve the party making the tender from further liability on the debt or obligation." 74 Am.Jr.2d Tender, 2. Our Supreme Court has said that "a tender is an offer to pay a debt, or discharge a duty, and, in the case of a debt, the offer to pay involves, as a general rule, the actual production of the money and the placing of it in the power of the person entitled to receive it." Mayron's Bake Shops Inc. v. Arrow Stores Inc., 149 Conn. 155-156 (1961). A tender must be unconditional and unqualified. Housing Authority of Bridgeport,137 Conn. 442, 447 (1951); 74 Am.Jur.2d Tender, 24. "It is the universal rule that a tender upon condition for which there is no CT Page 2767 foundation in the contractual relation between the parties is ineffective. . . But where the condition is one which a debtor has the right to insist upon, a tender made subject to that condition is valid." 52 Am.Jur.2d Tender 24. Swanson v. Baldwin, 90 N.W.2d 740, 742 Iowa (1958); Newark v. Block 86, Lot 30,228 A.2d 877, 882-883 (N.J.Super. 1967); 86 C.J.S. Tender, 32a. The general rule is that unless the parties agree otherwise or the creditor consents to receive payment in some other medium, the payment of an obligation may be made only in money. 60 Am.Jur.2d Payment, 32. It has been held that a debtor has no right to deed the property to his creditor in settlement of the debt when the contract provides for payment in money. 60 Am.Jur.2d Payment 51.
There has, however, developed in the law the concept of a deed in lieu of foreclosure. One authority has said: "Often the parties to a mortgage prefer to avoid normal foreclosure procedures. This can be accomplished if the mortgagor is willing to convey the secured property to the mortgagee as a substitute for foreclosure. In turn, the defaulting mortgagor in default is completely excused from the underlying obligation. . . After default occurs, . . . the parties are permitted to resolve their relationship by means of a deed in lieu of foreclosure. . . [The creditor must make a realistic determination as to whether his interests would be better served by foreclosing the property or taking an absolute deed instead."]** 3 Powell on Real Property 469.1[1]; see 9 Thompson on Real Property 4738 (1959 Sup.); 5 Tiffany Real Property (3d ed.) 1432-1434. It has been said that the offer of the deed alone is not tender of full payment because of potential questions of the validity of the title conveyed by the deed. Bank of Boston v. Platz, 41 Conn. Sup. 587 (1991) for reasons stated there. See also 4 American Law of Property 16.62-16.63. Moreover, it seems appropriate to say that the mortgagee cannot without his consent or willingness be required to accept a proffered deed of the property where payment is sought to be in another medium than that which the contract between the parties indicates or when, if the tender is conditional, it is made on condition or conditions that the mortgagor-offer has no valid ground to impose. See generally, Bank of Boston v. Platz, supra.
From what we have said we conclude that the proffer of the deed alone to the plaintiff was not even a valid tender and this is even assuming that at the time of the tender the property had a value of $200,000.00 as claimed. The offer was not to pay in money, the agreed medium. Taxes were in default and although required to be paid by the mortgage deed and note, the CT Page 2768 defendants' offer obviously included that as a condition of this "tender". There were also some arrears in interest payments. There was no response from the defendants to the plaintiff's suggestion of bringing the interest current, paying up the back taxes and turn over the security deposits. No waiver by the plaintiff of his rights under the mortgage deed and note, and for that matter of the defendants' duty, can be found. Although it was long in coming, the plaintiff's refusal to take a deed for the debt was clear. The plaintiff was under no duty to accept the defendants' proffer of the deed. The deed in lieu of foreclosure claim of the defendants is rejected.
We look now at the claims of delay in this litigation and we have outlined the contentions of the parties earlier on this aspect. In a word, at this point, the plaintiff claims that "were there a question of delayed enforcement of this mortgage, the defendants have not met their burden in proving that any delay was unfair or that it was caused by the Plaintiff. In fact [the plaintiff argues], there is not once [sic] scintilla of evidence established by the Defendant relative to this issue." The defendants argue that "a two year delay in prosecuting this foreclosure is an unreasonable delay which did in fact prejudice the defendants", that it was "intentional", "without justification" and that the plaintiff should be denied his claim for interest, taxes and costs which accrued subsequent to August 1, 1991.
According to the plaintiff's brief the mortgage has been in default since August 1, 1991 with interest being claimed from that date. This foreclosure action was not instituted until June 3, 1992, approximately ten months later. See Valley Cable Vision Inc. v. Public Utilities Commission, 175 Conn. 30, 33. Judgment of strict foreclosure was not entered until July 19, 1993, approximately twenty-three and a half months after the mortgage went into default and approximately thirteen months after this action was instituted. At the time of default and thereafter there were no liens, attachments or the like on the subject property as the other encumbrances were the plaintiff's mortgage and real estate taxes. The inference is quite strong that the span of approximately twenty-three and a half months from the time of default until judgment of strict foreclosure, in the circumstances of this case, justifies the granting of certain equitable relief to the defendants. The court is aware that in Connecticut "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its CT Page 2769 enforcement. (Emphasis in original). Restatement (Second) Contracts 231 (1973)." Central New Haven Development Corporation v. LaCrepe, Inc., 177 Conn. 212, 217 (1979).
Judge Cardozo put it tersely when he said "Equity does not act for every shadowy or insubstantial wrong." Nann v. Raimist,255 N.Y. 307, 319 (1931). The consequences, of course, of granting equitable relief should be balanced against the need for it. DiGiovanni v. Camden Fire Insurance Association, 296 U.S. 64
(1935); 27 Am.Jur.2d Equity, 107. Although equitable power must be exercised equitably, the determination of what equity requires a particular case, the balancing of the equities, is a matter for discretion of the trial court. Reynolds v. Ramos, 188 Conn. 316,320 (1982); Kakalik v. Bernardo, 184 Conn. 386, 395 (1981). In appropriate settings the plastic remedies of equity are molded to the needs of justice. Foreman v. Foreman, 251 N.Y. 237, 242
(1929 — Cardozo, J.).
Initially, we determine that equitable relief should be extended on the matter of interest on the original debt of $189,756.00 for the period from October 1, 1991 through June 3, 1992. The period covers a time starting two months after default by the defendants up to the institution of this foreclosure action. The plaintiff knew of the defendants' proposal at least by September 1991 and although he was very vague about when he authorized the institution of this action, he had counsel in September 1991 and there was no turndown by him until suit was instituted by service on June 3, 1993. There is little doubt that the defendants had in 1986 agreed to do certain things when they bought the property but the plaintiff knew in August 1991 that they could no longer perform as agreed. The plaintiff argues that the defendants could have shortened this litigation by agreeing to stipulate to a judgment of strict foreclosure. While this claim may have some validity as to a time after the foreclosure action was instituted, it hardly does for the period before the action was started. It was unfair and inequitable and prejudicial to the defendants for the plaintiff to have waited until June 1992 to institute this action.
If the plaintiff had acted by October 1, 1991, and that seems a reasonable time to do so, this entire matter could well have been greatly shortened and that includes his acting rejecting the proffered deed outright and instituting this action then and not months later. In light of what we have said, therefore, on equitable considerations we will deny to the plaintiff the CT Page 2770 payment of interest at the mortgage rate for the period October 1, 1991 through June 3, 1992. The reduction is at the per diem rate of $55.89 per day for 246 days and comes to $13,748.94. Thus the interest allowed from August 1, 1991 through July 19, 1993 on the original debt of $189,756.00 is now $26,4110.00, i.e. $40,159.52 minus $13,748.94.
This court is of the opinion that it has not been demonstrated that any further reduction of interest is equitably appropriate. The court has examined the court file. It has heard and evaluated the evidence. The stipulated judgment of strict foreclosure entered on July 19, 1993 after a motion for the same was filed by the plaintiff on June 9, 1993. The latter date was about one year after the action was instituted in June 1992. New counsel appeared for the defendants on October 26, 1992. The defendants did not file their answer and special defense until November 9, 1992 and that was after the plaintiff's motion for default for failure to plead. Their special defense was in the case until they withdrew it almost three months later on January 27, 1993. It is not necessary to discuss all the pleadings. The court cannot conclude that the defendants have sustained their burden of proof that the "delay" in this litigation was "intentional and without justification" so as to justify additional equitable relief as to interest and taxes. There was some delay that required relief and we addressed that for the period of October 1, 1992 to June 3, 1993 but the defendants have not proven delay as they claim for any period thereafter.
Insofar as the real estate taxes are concerned the plaintiff has paid up the taxes including what the defendants owed as of August 1, 1991. This court will not, nor does equity require it, make any adjustment in favor of the defendant for taxes. The plaintiff has paid as to taxes the sum of $16,041.57 and that remains the same.
One of the matters that would have moved this matter along more quickly was a stipulate to the entry of a judgment of strict foreclosure much earlier than it in fact occurred. The defendants could have undertaken to bring this about but there is no evidence they did or even attempted to.
As to the allowance of interest from the date of judgment, i.e. July 19, 1993 to the date of title vesting absolutely in the plaintiff, i.e. August 11, 1993, the allowance ordered for this 23 day period is $1,285.47. That amount is arrived at by CT Page 2771 multiplying the per diem rate of $55.89 by the 23 days involved.
Turning to the matter of attorney's fees, in the plaintiffs brief one of the items claimed to have been proven by the evidence is captioned "Costs on Original Judgment 19,431.50." The evidence discloses that the following items make up this $19,431.50 figure:
(1) Attorney's fees billed by plaintiff's counsel $ 14,020.00
(2) Christopher Miner, appraisal services 5,000.00
(3) Title search 150.00
(4) Writ fee 21.00
(5) Entry fees 125.00
(6) Sheriffs' fees 96.00
(7) Recording of Lis Pendens 17.50
 (8) Judgment file 2.00 ----------- $ 19,431.50
"Costs are the creature of statute . . . and unless the statute clearly provides for them courts cannot tax them." Verrastro v. Sivertsen 188 Conn. 213, 217 (1982). It would appear that items through (8) are taxable costs under statute, but they ought properly be taxed before the clerk of the court. Particularly is this so as there is no stipulation by the parties that they are appropriately taxable costs. As to item (3), that sum has already been allowed in the original judgment of July 19, 1993 most likely under General Statutes 52-249(b).
As to the claim for appraiser Miner's services in the amount of $5,000.00, several comments are made. First, the only evidence of such an amount for his services came in the plaintiff's direct testimony when the plaintiff was asked if he had "received an appraisal for Mr. Miner's. . . ." The answer was "Yes, he's been paid too, $5,000.00." He later also said "I paid the appraiser." No documentation of any sort, i.e. a statement of charges, a receipted bill, a cancelled check or the like was in evidence. It is noted that Miner submitted at least two written appraisals CT Page 2772 to the plaintiff, one dated March 1992 and the other in April 1993 and with each culminating in a different value. Moreover, on cross-examination Miner said that he had only learned on the first day of the hearing for a deficiency judgment that he had to bring his value opinion up to the August 11, 1993 date, and he did this. Next, the original judgment file of July 19, 1993 allows a $300.00 appraiser's fee ordered by the trial court (Teller, J.). Presumably this was done under General Statute52-297, Finally, there is no helpful explanation of the amount of time and effort involved in the two written Miner appraisals, both made before the strict foreclosure judgment of July 19, 1993, to assist this court in a fair evaluation of this $5,000.00 request. Miner was also the real estate expert at the time of the judgment of strict foreclosure according to his affidavit in the file giving his opinion of value of $90,000.00 as of May 6, 1993. In any event, Miner has already been allowed $300.00 as appraisal fee at the time of judgment of strict foreclosure. The judgment file there does not leave that matter open as it did on the matter of interest and that file notes on its face that judgment was "By Agreement." This court does not deem it appropriate to make any allowance for the plaintiff on account of the claim of $5,000.00 for Miner's services and it is denied in full.
In any event, this court does believe that a reasonable appraiser's fee should be allowed to Miner insofar as the deficiency hearing is concerned. Accordingly, Miner is allowed $500.00 in that regard.
We return to the items of counsel fees for plaintiff's counsel in item (1) where the claim for legal services is $14,040.00. We approach this matter by discussing them up to the time of the strict foreclosure judgment of July 11, 1993 (where the judgment file notes "Counsel fees: $ not ordered") and, thereafter, from that date forward. Again, as stated nothing has been paid on this amount of $14,020.00. The mortgage note provides for reasonable attorney's fees.
Before, however, getting into our disposition of this item, certain applicable legal principles should be set out. "The court has few duties of a more delicate nature than that of fixing counsel fees." Hoenig v. Lubetkin, 137 Conn. 516, 525 (1951). The United States Supreme Court has said that while "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate is the most useful starting point for CT Page 2773 determining the amount of a reasonable fee"; Helmsly v. Eckerhart [461 U.S. 424, 433]; it has also said that "the product of reasonable hours times a reasonable rate does not end the inquiry"; id. 434; because "there may be circumstances in which the basic standard of reasonable rates multiplied by reasonably expended hours results in a fee that is either unreasonably low or unreasonably high." Blum v. Stenson [465 U.S. 886, 897]. See Bank of Boston Connecticut v. Brewster, 42 Conn. Sup. 474,504-505. Courts have stressed the need to submit proper time records. See Bank of Boston Connecticut v. Brewster, supra; Denton v. Boilermakers Local 29, 673 F. Sup. 37, 53 (D.Mass. 1987). A court is not required to accept an attorney's valuation of his own time. See, e.g. Chraplivy v. Uniroyal Inc., 670 F.2d 760, 767
(8th Cir. 1982). The party seeking fees may introduce evidence in a claim for attorneys' fees. Bank of Boston Connecticut v. Brewster, supra 503, 504, 505. Unsworn statements of attorneys are not, however, evidence. Cologne v. Westfarms Associates,197 Conn. 141, 154 (1985). The circumstance that a request for fees may not be opposed does not divest the court of the power to determine what a reasonable fee is and to allow only that amount. Bank of Boston Connecticut v. Brewster, supra 506; see Wojtkowski v. Cade, 728 F.2d 127, 130 (1st Cir. 1984). Our courts have repeatedly held that "courts have a general knowledge of what would be reasonable compensation for services which are fairly stated and desirable." Piantedosi v. Floridia, 186 Conn. 275, 279
(1982).
The matter of attorneys' fees to be awarded to plaintiff's counsel for that portion of this litigation up to July 19, 1993 requires little discussion. During the trial counsel simply stated the number of hours said to have been allotted to this matter at a certain hourly rate. There was no documentation of that. The plaintiff did indicate that he had received a "legal bill" in the amount of $14,020.00 which bill was up to the date of the deficiency hearing. He also said that he had not paid the attorney. In fact, during oral argument defendants' counsel opined that the hourly rate offered was not particularly reasonable and that there was no testimony touching this matter. This was not responded to. Under all the circumstances this court will find a reasonable attorneys' fee up to July 19, 1993 to be $6,000.00, and it is ordered.
In addition, insofar as additional attorneys' fees allowed by the court since July 19, 1993 including the two-day trial on the deficiency judgment hearing, the court finds reasonable CT Page 2774 attorneys' fees to be $1,800.00, and it is so ordered.
This court has concluded, after considering all the claims of the parties, that there is a deficiency in the amount of $107,748.18. It has been computed as follows:
Judgment debt as of July 19, 1993;
Unpaid principal balance $ 189,756.00
 Interest from August 1, 1991 to July 19, 1993 @ $55.89 per diem for days allowed 26,410.58 ------------ $ 216,166.58
Attorneys' fees (up to July 19, 1993) 6,000.00
 Interest on debt (from July 19, 1993 to August 11, 1993 1,285.47
 Title search fee allowed by court on July 19, 1993 150.00
Appraiser's fee- allowed by court 300.00
 Real estate taxes on July 19, 1993 paid by plaintiff 16,041.57 ------------ $ 239,943.62
 Additional attorneys' fees re deficiency hearing 1,500.00
 Appraiser's fees re deficiency hearing 500.00 ------------ $ 241,943.62
 Less value of subject property as of August 1, 1993 as found by this court 140,000.00 ------------ Deficiency Judgment $ 101,943.62
The plaintiff's motion for a deficiency judgment against all the defendants is granted in the amount of One Hundred and One CT Page 2775 Thousand Nine Hundred Forty-Three ($101,943.62) Dollars and Sixty-Two Cents. In addition interest is awarded from August 11, 1993 in the amount of $27.92 per diem on said deficiency.
Arthur H. Healey State Trial Referee